UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRONTIER FISHING CORP. ) | CIVIL ACTION |
| ) | NO.04-11171-DPW |
| Plaintiff, ) | |
| v. ) | **PLAINTIFF'S MOTION** |
| ) | **FOR SUMMARY JUDGMENT** |
| DONALD EVANS, Secretary of the ) | **ORAL ARGUMENT** |
| UNITED STATES DEPARTMENT OF ) | **REQUESTED** |
| COMMERCE; AND CONRAD C. ) | |
| LAUTENBACHER JR. UNDER SECRETARY ) | |
| FOR OCEANS AND ) | |
| ATMOSPHERE/ADMINISTRATOR AND ) | |
| DEPUTY UNDER SECRETARY ) | |
| ) | |
| Defendants. | |

Now comes the Plaintiff, Frontier Fishing Corp. and moves for summary judgment, setting aside the Defendant Agency's finding that the Plaintiff violated certain regulations promulgated under the Magnusson Stevens Fishery Conservation Management Act 16 USC §1800 et seq. on the grounds that the decision below was arbitrary and capricious, not supported by substantial evidence and otherwise contrary to law.  Plaintiff further challenges the decisions of the Agency, by the ruling of the administrative law judge below to increase penalties beyond on the same grounds.  Plaintiff further seeks leave, in the accompanying motion to supplement the record to introduce an agency document, uncovered by an officer of the Plaintiff Corporation, which appears to explain the Agency's error in mistakenly concluding the Plaintiff's fishing vessel, SETTLER was the target identified in a Restricted Gear Area RGA1.  This document is referred to contingent upon leave being so granted.

I.      **BRIEF STATEMENT OF THE CASE**

This action arises out of an alleged fisheries violation on October 16, 1997 by the F/V SETTLER, a 90 foot trawler scallop fishing vessel hailing from New Bedford, Massachusetts. On that night, USCGC SPENCER, a 270 foot medium endurance cutter, was patrolling in an area adjacent to Veatch's Canyon, known as Restricted Gear Area One (RGA1).  This is an irregularly shaped closure, defined by 106 waypoints, closed to mobile gear during certain times

1

of the year to separate mobile gear from fixed lobster gear.  At approximately 21:05 the SPENCER detected a radar target to which the vessel's Combat Information Center (CIC) assigned a unique contact number 8174.  At 21:40 the SPENCER's crew plotted a target to its northeast and using its Differential Global Positioning System and its radar unit, connected to a computer known as COMDAC, determined the target (assigned contact number 8174) to be within RGA1.  The SPENCER's crew also visually observed a vessel showing lights indicating fishing activity in the same area, which it believed to be the vessel being tracked on radar.  Over the course of the next 30 minutes, as the SPENCER sped towards the visually sighted target at speeds close to 15 knots, it tracked one or more contacts in RGA1 and established target points from 21:40 to 21:58, referred to as A1, A2, A3 and A4.  At approximately 22:00 the SPENCER passed the SETTLER, starboard to starboard, and executed a turn between 22:01 and 22:02 and proceeded southward on a track parallel to the western border of RGA1, where the SPENCER traveled on the port quarter of the SETTLER for a few minutes until the SPENCER initiated contact at 22:05.  At 22:08 the SPENCER took a position alongside the SETTLER and established her position.  In effect, the Agency argues that based on the location where the SETTLER was ultimately encountered, she was the target tracked in the closed area and was therefore in violation of the RGA1 restrictions.  The Agency relies heavily on the conclusion that the targets inside of RGA1 were the SETTLER based on the absence of any other vessels or radar contacts.

      Plaintiff contends that the SETTLER had properly mapped RGA1, set out her gear at approximately 21:30 and was proceeding southward along the western side of RGA1 as depicted in the Peterson drawing, Agency Exhibit 46 and figure 3 to the Ouellette Report, Agency Exhibit 41.  Plaintiff contends that the SPENCER incorrectly identified her as the target inside of RGA1, and that the uncontroverted evidence, primarily the SPENCER's recorded DGPS positions and the known point of passing just before the SPENCER turned at 22:01 prove conclusively that SETTLER could not have been at the radar points inside of RGA1 as alleged.

      Plaintiff believes that the SPENCER crew, having mis-plotted the closed area on their charts, erroneously believed that the discrepancy between the SPENCER's radar plots and her

crew's visual observations of the SETTLER did not affect the validity of this case against SETTLER.  The SPENCER crew's improper plot of the closed area placed the SETTLER inside based on her stated position when she started her tow and when the SPENCER came alongside. Because the observations of the SETTLER do not correlate with the radar targets, the SETTLER could not have been at the points inside RGA1 as alleged, and the judge's decision is both contrary to the evidence adduced at hearing and not supported by substantial evidence.

Plaintiff also contends that the course and speed testified to by the Captain, and plotted by both Dr. Peterson, Agency Exhibit 46 and Mr. Ouellette, Agency Exhibit 41, establish that the SETTLER's claimed path is entirely consistent with the SPENCER's visual observations, points of meeting and SPENCER's reported positions.

Plaintiff contends that since it was trawling in between the SPENCER and an area used extensively by lobster trap vessels, that its small radar cross section could easily have been "overshadowed" by a the strong radar reflection of lobster vessel in the RGA1, vessels which are known to carry many "high flyers", each of which has a much larger radar cross section than a 90 foot fishing trawler.

The ALJ increased the agency penalty from $10,000 to $30,000, in addition to a loss of 30 scalloping days, or more than one quarter of the vessel's 100 days.

## II.    DISCUSSION OF DOCUMENTS SUPPLEMENTAL TO THE RECORD

The Agency challenges Plaintiff's theory that the SPENCER must have been tracking another vessel or high flyers on radar by presenting testimony that there were no other vessels sighted visually or on radar and that the SPENCER crew could distinguish vessels from high flyers.  As noted in Plaintiff's accompanying motion to supplement the record, during preparation for this case, the Plaintiff's principal reviewed a document that was produced by the Agency on the eve of hearing, along with certain documents from the Combat Information Center.  Although the Agency challenges this document, it was discovered and produced by the Agency three days before the first hearing and produced by Agency with CIC information.  CIC was supposedly tracking the SETTLER but no evidence of the CIC tracks was introduced at trial. The document bears the date of October 16, 1997, a time of 10:19 and refers to the SETTLER

and the CIC designation for the SETTLER's track, No. 8174, and gives a different range and bearing to the SETTLER than A1-A5. Since the SETTLER left port on the morning of the 16th, the only time it was tracked was during the evening, and the unique CIC number 8174 was assigned at 21:05 on the night of October 16, 1997. CIC is an isolated section of the SPENCER, where crew works electronic instrument separate from the rest of the ship. At the time the CIC plot was apparently generated, the SETTLER was actually alongside the SPENCER. If a target was detected 1.4 nm bearing 131, it was clearly not the SETTLER. Too coincidentally, the course and speed indicated for the CIC plot indicates that it was moving on a course that shows it was the target at point A4. Adding to the coincidence is that the SPENCER left the SETTLER and navigated precisely towards this CIC plot at 22:48 to 23:05. The SPENCER crew claimed to have seen no other targets that evening, yet they clearly went into RGA1 after something- apparently it was another target that may not have been reported to the Agency, or in turn the ALJ. Plaintiff contends that the Court should accept this as supplemental evidence to the record, or alternatively allow plaintiff to take out discovery on this point.

### III.     FACTS PLAINTIFF CONTENDS ARE NOT IN DISPUTE AND THAT DO NOT INVOLVE SUPPLEMENTING THE RECORD

1. On the evening of October 16, 1997 while on patrol adjacent to an area known as RGA1, when it detected a radar target inside an area the crew of the SPENCER believed was RGA1.

2. On the night of the incident, the crew of the SPENCER relied on a handwritten plot of RGA1 drawn on a navigational map, AR v$^1$. III Testimony of Diaz at p. 49, see AR v. V at Agency Exhibit 15. See also Gerald A. Ouellette's analysis of the USCG plot of RGA1, AR v. III and Agency Exhibit 41 at page 4.

3. The SPENCER crew erroneously determined the borders of RGA1 on the night of the incident. Id.

4. The Agency continued to fail to have the proper plot of RGA1's boarders as late as April 24, 2000 when the USCG legal office claimed that the SETTLER's claimed "set out" position at 40°01.28'N by 070°11.46'W, was inside the closed area. See AR v Figure 12 to Ouellette Report, Agency 41 at page 12.

5. As noted in the ALJ's decision, the SETTLER's fine was actually increased because the SETTLER's stated start position at 40°01.28'N by 070°11.46'W was outside of the closed area. See ALJ decision, AR v. II, and tab 106 at page 20.

6. The target detected at 21:05 was assigned contact number 8174 by the Combat Information Center. AR v. V Agency Exhibit 19. AR v. III Testimony of Diaz, at page 46.

7. The USCG SPENCER visually detected a white over green light indicating a vessel engaged in fishing operations to her port at 21:30, testimony of Diaz, AR V. III at p. 39.

8. The SPENCER began to track the radar target and at 21:40 hours, testimony of Diaz, AR v. III p. 44 and plotted the target at four points, A1-A4 at 21:40, 21:47, 21:52 and 21:58, AR v. V, Agency Exhibit 14

9. At 21:47 the SPENCER plotted a radar target at a range of 7600 yards and a bearing of 36° true. Referred to as A2, AR v. V, Agency Exhibit 14.

10. The SPENCER's position was being automatically Logged by a Differential Global Positioning system that recorded its position virtually every minute in a document referred to as the Header Log. AR. v. V, Respondent's Exhibit 1, testimony of Diaz, AR V. III, p. 121.

11. The SPENCER's course was plotted from the Header Log by the Agency's expert Peterson and Plaintiff's expert, Gerald A. Ouellette. Those plots are set forth in AR v. V, Exhibit 46, Attachment 1 and also at AR. v. V, Agency Exhibit 41, -

---

[1] "AR v." is the Administrative Record Volume.

Peterson's drawing is on page 12, Figure 7, Mr. Ouellette's drawing is Figure 3 on Page 9. These accurately set forth the course of the SPENCER during the evening in question during the times stated and are not disputed by either side.

12. The Agency produced Exhibit 16, AR v. V, which does not represent the course of the SPENCER at all times, but represents a line drawn between the DGPS points on Agency Exhibit 14, AR v. V, at which the SPENCER was located when it took radar plots of the target believed to be in RGA1, Diaz testimony, AR v. III at page 57. Contrast Agency Exhibit 16 to the drawings of Peterson and Ouellette, Figures 3 and 7 to the Ouellette Report, AR v. V, Agency Exhibit 41, and Peterson drawing at AR. v. V, Agency Exhibit 46, Attachment 1.

13. The SPENCER made a turn to port at 21:47 as evidence by the change in course derived from the Header Log and depicted on Ouellette report, AR v. V, Figures 3 (Ouellette) and 7 (Peterson) of Agency Exhibit 41.

14. From 21:47 to the turn executed between 22:01 and 22:02, the SPENCER maintained a constant course of 28 degrees true based on a plot of her Header Log, see drawings of Ouellette and Peterson, figures 3 and 7, AR v. V, Exhibit 41.

15. From 21:47 to 22:01 the SPENCER was heading towards the lights of the fishing trawler, allowing the trawler to evidence a slight drift to starboard to allow SPENCER to come around behind her. AR v. III Diaz testimony, page 66, lines 8-25 and page 67, Lines 1-3. See also AR v. V Diaz report, Agency Exhibit 19.

16. The lighted fishing vessel showed her starboard, green light, to SPENCER, indicating passage from right to left across SPENCER's track. Id.

17. At 21:52 the SPENCER plotted a radar target identified as A3 in the Peterson and Ouellette drawings at a range of 6000 yards bearing 33° true, AR v. V Agency Exhibit 14.

18. The target at A3 would have been 5° to the right of the SPENCER's track, based on simple mathematical calculation, Ouellette Report, AR v. V, Exhibit 41.

6

19. A target moving from A1 to A2 and then from A2 to A3 would have had to have altered course, thereby showing its bow to SPENCER (red and green lights) and then traveled with her port (red light) visible to SPENCER for almost five minutes. See Peterson and Ouellette drawings, figures 3 and 7 to AR. v. V, Agency Exhibit 41, and discussion therein

20. There is no indication in the record that the crew of the SPENCER observed a change in lights showing on the SETTLER to indicate that her bow or port side was visible to the SPENCER, or any other visual indication that the lighted SETTLER had changed course.

21. A vessel following the Plaintiff's claimed path of the SETTLER from 21:30 to 22:08, as depicted in the Ouellette drawing, AR. v. V, Agency Exhibit 41 and the Peterson drawing, AR, v. V, Agency Exhibit 46, is consistent with the visual observations from the SPENCER

22. There is no record that the sighted vessel changed in bearing from the SPENCER from 21:47 until 22:00 when the SPENCER passes the SETTLER starboard to starboard. AR v. IV at page 908, Line 8 to 21.

23. At 21:58 the SPENCER plotted a target, A4 inside of RGA1 at a bearing of 61° true and a range of 2600 yards, AR v. V, Agency Exhibit 14.

24. Target A4 was 33° relative off of the SPENCER's track as plotted from the Header Log, Ouellette report, AR v. V, Agency Exhibit 41 and Peterson Drawing, AR. v. V, Agency Exhibit 46.

25. The SPENCER continued on her course of approximately 28° true to intercept the lights of the SETTLER, although the radar target was now 66° true (33° relative) off of her bow, AR. v. V, Agency Exhibit 14 and Peterson Drawing, AR. v. V, Agency Exhibit 46.

26. The SPENCER did not alter their course to intercept after the 21:47, 21:52 or 21:58 radar plots. Header Log, AR v. V, Respondent's Exhibit 1, Peterson and Ouellette drawings, AR v. V, Agency Exhibits 41 and 46.

27. The SPENCER did not change course from 21:47 to 22:01, Testimony of Diaz, AR v. IV, p. 908, lines 3-7.

28. At all times the SPENCER crew was looking at the starboard side of the SETTLER, testimony Diaz, AR v. IV, page 908 line 8 to 21.

29. Prior to initiating a turn between 22:01 and 22:02, the SPENCER passed the SETTLER, starboard to starboard, AR v. III Diaz testimony at pages 119 line. 5-13.  p. 70 line 3-6.

30. At 21:58 the SPENCER determined the range to the A4 target as 2600 yards, AR v. V, Agency Exhibit 14.

31. A pure mathematical calculation indicates that for the two vessels to have covered 2600 yards, assuming they are on true reciprocal courses from the 21:58 (A4) radar plot to the initiation of the turn after the passing, they must have been closing at a speed of 35.51 knots.  Speed=distance/time(2600 yards/2 minutes).

32. The Agency concludes that the SETTLER proceeded directly from A4 to A5, the next fix taken by the SPENCER.  See AR v. V Agency track of SETTLER in Ouellette and Peterson drawings, figures 3 and 7 to Ouellette report and Peterson Drawing Agency Exhibit 41 and 46.

33. The SPENCER's speed, as established by the Header Log, at the time of the passing was 15.4 knots, Ouellette Report, AR v. V, Agency Exhibit 41.

34. The SETTLER was shown to be only theoretically capable of moving slightly more than 5.7 knots while trawling and only then if she let her trawl wires run free.  AR v. IV at page 829, Sederstrom testimony

35. The SPENCER could not have passed the SETTLER starboard to starboard if it were moving from A4 to A5 at 22:00 or 22:01 without exceeding 20 knots (Closing speed less SPENCER's speed, 35.51-15.4=20.11).

36. Since the vessels were not on reciprocal courses, the distance was greater and an even higher closing speed required for the vessel to pass.

37. The SPENCER initiated its turn between 22:01 and 22:02 and at 22:05 was traveling in a southward direction roughly on a southern heading, 350 yards off of the SETTLER's port quarter, Header Log, AR. v. V, Respondent's Exhibit 1, Ouellette and Peterson Diagrams, AR v. V, Exhibits 41 and 46.

38. Commander Diaz stated that at 22:02 on completing the turn around SETTLER, SPENCER was off of the port quarter of SETTLER, AR v. IV page 592, lines 17-20.

39. For the SPENCER to have turned around the SETTLER, in a turn commenced between 22:01 and 22:02 and to have traveled on her port quarter prior to 22:05 for a few minutes, the SETTLER must have been inside, or to the west of the SPENCER's track through its turn, as determined by the Header Log, prior to the SPENCER actually making the turn.  (You can't turn around something that is not there)

40. The turn executed around SETTLER occurred as anticipated by the SPENCER based on visual navigation to the intercept.

41. The Agency's expert, Peterson, in his drawing establishes that if, as the Agency alleges, the SETTLER moved from A4 to A5 between 21:58 and 22:08, the SETTLER would have been off of the SPENCER's port bow.  Figure 7 to the Ouellette Report, Agency Exhibit 41, and Agency Exhibit 46.

42. The Agency witnesses all stated, and the ALJ concluded, that the SETTLER was to starboard of the SPENCER after it made its turn executed between 22:01 and 22:02.  AR v. II, Tab 106 page 42.

43. The position of the SPENCER after her turn is established by the Header Log.

44. The SPENCER was positioned, based on her Header Log to be no more than 60 yards within the closed area.  AR v. V Respondent's Exhibit and Agency Exhibits 41 and 46.

45. The Agency contends that based upon the Header Log data, the SPENCER carried out a turn to starboard of about 149 degrees bringing it to a heading about

9

177 degrees true, or nearly due south during the one minute integral between 2201 and 2202. AR v. II, Tab 106, page 48.

46. The Agency contends that the location of the USCGC SPENCER in the RGA1 is unknown despite accepting the Header Log data. AR v. II, Tab 106, page 48.

47. The Agency contends that, despite the Header Log, it does not know the position of the SPENCER in the closed area after the encounter, ALJ decisions, response to Respondent's Request for Ruling H4, AR v. II, Tab 106, page 48.

48. The Agency ALJ disagrees with the Header Log when it does not place the SETTLER far enough into RGA1, arguing that the Header Log position is not as far inside as SETTLER must have been. AR v. II, Tab 106, page 49.

49. The agency contends that despite the Header Log, it does not know the location of the SPENCER vis a vis the RGA1, and hence can not agree that the SETTLER was outside. AR v. II, Tab 106, page 47.

50. The Agency contends that despite the testimony of USCG eyewitnesses, and the position and timing of the SPENCER's turn based on the Header Log, it can not fix the SETTLER's position with regard to the closed area at any time from 21:58 to 22:08. AR v. II, Tab 106, page 48.

51. After the turn, the SPENCER was paralleling the RGA1 closed area border, Header Log, AR v. V, Respondent's Exhibit 1, as depicted in Ouellette and Peterson Diagrams, AR v. V, Agency Exhibits 41 and 46.

52. The SETTLER's track after she was rounded by the SPENCER was consistent with her claim she had set out to the west of RGA1 proceeded southward outside the border of RGA1, Header Log, AR v. V, Respondent's Exhibit 1, and Ouellette and Peterson diagrams, AR v. V, Agency Exhibits 41 and 46.

53. For a vessel to have moved from the 21:58 radar plot A4 to a position inside of the turn of the SPENCER at 22:01 to 22:02 it would have had to have covered the reported .83 nm in two minutes, requiring a speed in excess of 25 knots (.83 nm/2

10

minutes), far in excess of any possible speed of the SETTLER, Radar Log, AR v. V, Agency Exhibit 14. See Paragraph 34 above.

54. The Agency offered Exhibit 16, AR v. V, to show the course of the SPENCER and the closing aspects of the two vessels.

55. The SPENCER had completed its turn at 22:02 and was on the SETTLER's port quarter, Header Log, AR v. V, Respondent's Exhibit 1, as depicted in Ouellette and Peterson Diagrams, AR v. V, Agency Exhibits 41 and 46. AR v. IV at 592 Lines 17-20.

56. At 21:58, the SPENCER detected contact 8174 at a distance of 2600 yards and a bearing of 61° true, Agency Exhibit 14.

57. At 21:58 the bearing to the radar contact recorded at plot A4 was approximately 8 degrees to the right of the SPENCER's course, AR v. V, Radar Plots, Exhibit 14, Header Log, Respondent's Exhibit 1, as depicted in Ouellette and Peterson Diagrams, AR v. V, Agency Exhibits 41 and 46.

58. At 21:52, the radar target supposedly moved from location A2 to A3, which would have required a change in course so that the targeted vessel had swung her bow towards the SPENCER through to the point that her port or red light would have been visible, and the SPENCER would no longer have been on an intercept course, Header Log, AR v. V, Respondent's Exhibit 1, as depicted in Ouellette and Peterson Diagrams, AR v. V, Agency Exhibits 41 and 46.

59. At 22:01, the SPENCER executed a starboard turn at 15 knots, turning 149 degrees, came around behind the SETTLER and followed on her port quarter, paralleling her course her until the 22:08 position fix, Header Log, AR v. V, Respondent's Exhibit 1, as depicted in Ouellette and Peterson Diagrams, AR v. V, Agency Exhibits 41 and 46.

60. The Agency presented theoretical evidence to show that the SETTLER could have transited from point A4 to the 22:08 position, A5, if it let out its net cables,

but this assumed the vessel proceeded in a straight line from A4 to the A5 position established at 22:08. AR IV at 829.

61. A vessel proceeding directly from A4 to A5 could not have been inside of the SPENCER's turn initiated between 22:01 and 22:02, nor could the SPENCER have followed along her port quarter for a few minutes prior to 22:05, Header Log, AR v. V, Respondent's Exhibit 1, as depicted in Ouellette and Peterson Diagrams, AR v. V, Agency Exhibits 41 and 46. AR v. III at 70 Lines 3-6 and 119 lines 5-13.

62. The accuracy of all radar plots on the evening of the October 16, 1997 was based on the SPENCER's DGPS, Exhibit 14 data derived from COMDAC.

63. The ALJ rejected the accuracy of the DGPS and Header Log when used by Plaintiff to establish the position of the SPENCER to establish that the SETTLER could not have been on the course from A4 to A5, ALJ ruling on Respondent's Request for finding H4 holding "…the exact location of the SPENCER in the restricted gear area is unknown." AR v. II, tab 106, page 48.

64. The report of Gerald A. Ouellette, Agency Exhibit 41, accurately calculates course speed and closing aspects of the SPENCER based on the Header Log, Respondent's Exhibit 1 and radar plots, Agency Exhibit 14.

65. The Agency offered no expert opinion which justifies deviation from the sworn testimony of its agents with regard to the times and aspects of the SPENCER passing.

66. The SPENCER did not maintain a constant radar track on target 8174 or the SETTLER, but only established discrete radar fixes during the course of the evening of October 16, 1997, AR v. V Agency Exhibit 14.

67. The Agency's rejection of Plaintiff's proposed findings of fact was clearly arbitrary and capricious, not supported by substantial evidence and contrary to facts accepted at the hearing from AR II Tab 106:

A.  Respondents' Proposed Find Findings of Fact D-2, page 35:

Based on the contact data sheet, and the Header Log, before the turn at 2147, a radar target was 50 degrees off the *Spencer's* port bow, and after the turn at 2147, a radar target was 8 degrees off the *Spencer's* starboard bow.  Thereafter at 2152, a radar target was 5 degrees off the *Spencer's* starboard bow and, at 2158, a radar target was 33 degrees off the *Spencer*'s starboard bow.  Agency Exhibit 14.

**RULING: The relative position of the USCGC *Spencer* to the *F/V Settler* is unknown.**
*(See also* #4, page 36, #8, page 49 of the Initial Decision).

B.  Respondents' proposed finding of fact H-2, page 47 reads as follows

Once the *Spencer* completed its turn to starboard at 2202, it headed due south, paralleling the *Settler.*  Agency Exhibit 41 at 4, 9 Fig. 3.

**RULING: Rejected.  The relative position of the USCGC *Spencer* vis-à-vis the F/V *Settler* is unknown.**

C.  Respondents' Proposed finding of fact H-4**,** page 48 reads as follows:

The Header Log demonstrates that after completing the turn, *Spencer* was about 50 yards inside of the Restricted Gear Area moving parallel to the boundary in a southerly direction.  Exhibit 41 at Fig.  3.

**RULING.  REJECTED.  The exact location of the USCGC *Spencer* in the Restricted Gear Area is unknown.  See also Respondents Proposed Finding of Fact H(2) and the Ruling thereunder.**

D.  Respondents Proposed Findings of Fact H9, page 49 reads as follows:

9. Clearly, *Spencer* was not moving parallel to the track line between the 2158 (A-4 to 2208 (A-5) radar locations, nor was it far enough inside of the gear area to follow down behind such a purported target.

**RULING: REJECTED. The overwhelming weight of the evidence shows the F/Y SETTLER was plotted up to seven-tenths of a mile inside Restricted Gear Area I at 2140, and then again at 2147,2152, and 2158. <u>See</u> (Agency Exhibit 14-24, 26, 29, 37; Agency PFF 9-12; Tr. 61-62, 71-75, 82-83, 94-95, 113, 204, 215, 216, 268, 579, 592). The evidence shows that the F/V SETTLER was .66 nautical miles inside Restricted Gear Area 1 at 2158, and the vessel was still inside Restricted Gear Area I at 2200.. (Agency Exhibit 32). Thus, the USCGC SPENCER must have been further inside the Restricted Gear Area to come around the *F/V* SETTLER around 2200.**

13

IV. **FACTS ESTABLISHED BY THE DOCUMENTS SUPPLEMENTAL TO THE RECORD**

68. The document of a Fifth Plot, identified as 8174, inside RGA1, Exhibit A to Plaintiffs motion to supplement the record is a copy of a CIC record produced by the Agency during proceedings below, **Affidavit of Harriet Diedreksen**.

69. This Fifth Plot by CIC of a target in RGA1 was not reviewed by the Agency prior to or offered at hearing, and was never reviewed by the Agency's expert, nor was it provided to the ALJ, **AUSA Johnson letter**.

70. The document evidences that at 10:19 on October 16, 1997; COMDAC reported a target inside at a range of 1.4 nm, and bearing of 131° true.

71. CIC assigned the track identifier at 21:05 on the evening of October 16, 1997. AR v. V, Agency Exhibit 19.

72. The CIC plot referenced on the Fifth Plot was taken by CIC from the SPENCER on the evening of October 16, 1997 at 22:19 pm, CIC plot.

73. A plot of the range and bearing indicates that the Fifth Plot was inside RGA1, **Affidavit of Gerald A. Ouellette**.

74. The radar target was calculated by COMDAC to have a course of 173° true, CIC plot,

75. A vessel on a course from A4 to the Fifth Plot inside RGA1 would have been on a course of 173° true, Affidavit of Gerald A. Ouellette.

76. The target reported in the newly discovered document sates it is contact 8174, and was proceeding at heading 173 at10:19 (believed to be 22:19), CIC record.

77. COMDAC calculated the course of the target at A4 as 173° true, A.R. v. V Agency Exhibit 14.

78. At 22:48, the SPENCER left the side of the SETTLER and proceeded directly at the position of the Fifth Plot inside RGA1 noted on the CIC Log. See AR v. V Header Log, Respondent's Exhibit 1 and Affidavit of Gerald A. Ouellette.

79. The Agency has been offered the opportunity to review the CIC documents and reconsider its decision, and has declined to do so, AUSA Johnson Letter.
80. The target detected by CIC is the vessel that was plotted at points A1, A2, A3 and A4, Affidavit of Gerald A. Ouellette.

WHEREFORE, For the foregoing reasons, Plaintiff contends that there is no genuine issue of material fact that the Agency did not have substantial evidence of a violation and acted arbitrarily and capriciously in finding the F/V SETTLER was in fact inside of RGA1 on the evening of October 16, 1997. Further, in light of the discovery of an additional radar plot that appears to establish that the contact inside RGA1 remained inside RGA1 and could not have been the SETTLER, this court must reverse the Agency's decision, allow further discovery on the new plot, or remand to the Agency to have it investigate and take reconsider its decision in light of the previously ignored evidence.

Respectfully submitted this 7TH day of April, 2005,

**FRONTIER FISHING CORP**
By its attorneys
*/s/ Stephen M. Ouellette*
Stephen M. Ouellette, Esquire
BBO No.: 543752
David S. Smith, Esquire
BBO No.: 634865
CIANCIULLI & OUELLETTE
163 Cabot Street
Beverly, MA 01915
Tel: (978) 922-9933
Fax: (978) 922-6142