UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRONTIER FISHING CORP. | ) | CIVIL ACTION |
| Plaintiff, | ) | NO.04-11171-DPW |
| v. | ) | |
| | ) | **MEMORANDUM IN SUPPORT** |
| DONALD EVANS, Secretary of the | ) | **OF PLAINTIFF'S MOTION** |
| UNITED STATES DEPARTMENT OF | ) | **FOR SUMMARY JUDGMENT** |
| COMMERCE, ET. AL. | ) | **ORAL ARGUMENT** |
| Defendants. | ) | **REQUESTED** |

Plaintiff, Frontier Fishing Corp. files this memorandum in support of its motion for summary judgment to set aside the Defendant Agency's finding that the Plaintiff violated certain regulations promulgated under the Magnusson Stevens Fishery Conservation Management Act 16 USC §1800 et seq. An accompanying Motion to Supplement seeks to have this Court review an additional document that affirmatively proves that the Agency's findings were in error.

## I.      PROCEDURAL HISTORY AND FACTS

On the evening of October 16, 1997, the fishing vessel SETTLER, a 90 foot trawler, scalloper from the port of New Bedford, Massachusetts, was trawling for monkfish when it was approached and boarded by the crew of the SPENCER and advised that she was accused of having fished in an area known as Restricted Gear Area One (RGA1) in violation of 50 CFR 648.81(j). The captain politely accommodated the boarding team, showed them where he had set out and the plot he had followed, all outside of RGA1. The SPENCER issued a written citation and allowed SETTLER to continue fishing. The SPENCER's crew believed that the starting position given by Captain Valente was in RGA1, See AR v. II, Tab 106.

Twenty eight months later, on February 28, 2000, the Agency issued a Notice of Violation and Assessment (NOVA) and Notice of Permit Sanction (NOPS) whereby the Agency sought to impose a civil fine of $10,000 and impose a sanction reducing the vessel's allotment of 88 multispecies days at sea by 30 days-at that time the SETTLER held an 88 day groundfish

permit and a then 120 scallop permit.  On March 1, 2001, the Agency amended its NOPS to substitute scallop days for multispecies days, after the Agency determined that the SETTLER had been incorrectly issued a groundfish permit.  At the time of initial assessment, the penalty represented 30 of 228 fishing opportunity days-now it represents 30 of the vessel's 40 open access scallop days.[1]  A hearing on the alleged violation was held on August 14 and 15, 2001 and November 19 and 20, 2002 before United States Coast Guard Administrative Law Judge Parlen McKenna (ALJ).  On August 5, 2003, the ALJ affirmed the Agency's finding of a violation and increased the monetary penalty from $10,000 to $35,000, See AR v. II Tab 106.  Plaintiff thereafter brought a petition for discretionary review pursuant to 15 CFR 904.273, which was denied on May 3, 2004.  Plaintiff timely filed this action seeking to reverse the decision of the Agency.  Due to space limitations, Plaintiff incorporates by reference the statement of facts contained in the motion for summary judgment, hereinafter referenced as MSJ.

## II.     DISCUSSION OF DOCUMENTS SUPPLEMENTAL TO THE RECORD

The Agency challenges Plaintiff's theory that the SPENCER must have been tracking another vessel or high flyers on radar by presenting much testimony that there were no other vessels sighted visually or on radar that evening and that the SPENCER crew could distinguish vessels from high flyers.  As noted in Plaintiff's accompanying motion to supplement the record, during preparation for this case in October 2004, Plaintiff's principal, Harriet Didriksen, reviewed a document that was produced by the Agency on the eve of the first hearing, along with a radar manual and logs from the Combat Information Center (CIC).  The document shows a fifth radar plot inside of RGA1 on the night of the alleged violation which appears to be moving from the plot A4.  If the document is accepted, it completely exonerates SETTLER by

---

[1] A scallop vessel is now allowed 40 open area days and a number of "closed area trips."

establishing that the radar target at A4 continued in RGA1, rather than emerging from RGA1 to meet the SPENCER as the Agency claims.

## III.    STANDARD OF LAW

The scope of this Court's review of an Administrative proceeding is generally limited to the administrative record that was before the agency at the time the decisions were made. *5 U.S.C. § 706*; *Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971)*; *Camp v. Pitts, 411 U.S. 138, 142, 36 L. Ed. 2d 106, 93 S. Ct. 1241 (1973)*. Courts reviewing final agency action must hold unlawful and set aside agency action and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *5 U.S.C. § 706(2)(A)*.

The Agency's findings of fact underlying the civil penalty imposed will be set aside if not supported by substantial evidence in the record. *16 U.S.C. § 1858(b)*; *5 U.S.C. 706(2)*. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 217, 83 L. Ed. 126, 59 S. Ct. 206 (1938)*. It is "more than a mere scintilla." Id. Further, the substantiality of the evidence must take into account the "record in its entirety," including "whatever in the record fairly detracts from its weight." *Universal Camera v. NLRB, 340 U.S. 474, 488, 95 L. Ed. 456, 71 S. Ct. 456 (1951)*. The substantial evidence standard, however, "certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51 (1st Cir. 2003)*. It is, after all, the prerogative of the ALJ to

> draw inferences and make credibility assessments, and [courts] may not disturb his judgment and the [agency's] endorsement of it so long as the findings are adequately anchored in the record. Id.

With respect to questions of law other than an agency's interpretation of a statute it administers, courts review the determination of the agency de novo. *Id. at 55*; *5 U.S.C. § 706*

## IV.    THE AGENCY AND ALJ IMPROPERLY FOUND THAT THE VESSEL TRACKED IN RGA1 WAS THE SETTLER BY SELECTIVELY ADOPTING AND THEN DISAVOWING ESTABLISHED FACTS

The case can be resolved based on the sole fact that it was physically and mathematically impossible for the SETTLER to have traveled from the alleged radar plotted position A4 at 21:58 to where it was rounded by the SPENCER at 22:01 and visually observed to be on the right side of the SPENCER at all times after 22:02. See Attachment C, Petersen Diagram. The Agency has no explanation for this exculpating discrepancy yet it charges forward. While the Agency presented testimony from which one could, if accepted at face value, conclude that the SETTLER was the only vessel in the region, the undisputed evidence in the form of the Header Log established that the SETTLER was at specific locations at specific times which make it impossible for her to have been the target tracked in RGA1. The testimony of the Agency witnesses is entirely inconsistent with the track the Agency and the ALJ claim the SETTLER was navigating during the time leading up to 22:08. Only by selectively accepting and then rejecting indisputable evidence, in particular the validity of the Header Log, and sworn testimony of Coast Guard officers could the Agency achieve the result that it did in finding that the SETTLER committed the violation alleged. MSJ p.8 ¶¶ 28-45. Plaintiff contends that rather than actually weigh the evidence, the ALJ and the Agency selectively accepted and later rejected the same evidence, in an arbitrary and capricious fashion to achieve a predetermined result wholly inconsistent with the testimony of Agency witnesses and undisputed evidence. See Discussion *infra*. In short, the Agency's finding is not supported on the record.

The Agency case is based on the location of the two vessels at 22:08, and establishing that the SETTLER had moved from location A4 at 21:58 to A5 at 22:08 where it was intercepted

by SPENCER. MSJ p.12 ¶63, and ignores all evidence in between those times. The Agency

argued that the SETTLER, whose normal speed while towing a net was 2 to 3 knots could, in

theory, have increased speed to over 5.7 knots by letting her net cable loose, thereby freeing

herself from the drag of the net, until the cables ran out to temporarily achieve the 5.5 knots

necessary to travel in a straight line from A4 to A5 in the ten minutes available. MSJ p.8 ¶34.

As preposterous and impractical as this theory was, the ALJ accepted that the SETTLER could

have performed this single, sudden burst of speed (ignoring the fact if SETTLER was in the

RGA1, this one time opportunity had already been expended in a similar burst of speed from A3

to A4.)[2] A.R. v. II Tab 106. The difficulty with the Agency's position is that based on the

testimony of the Agency witnesses, and the findings by the ALJ, at the point of the turn by

SPENCER at 2201 to 2202, the SETTLER was inside of the turn and remained to SPENCER's

starboard for a few minutes before 22:05, see the Peterson and Ouellette diagrams, appended

hereto. MSJ p.9 ¶¶37-45. The Header Log indisputably places the SPENCER in a position West

of RGA1, and the testimony of the Agency witnesses places the SETTLER inside of

SPENCER's turn. Id. For the SETTLER to reach this position at 22:00 from the A4 plot at

21:58, SETTLER would have had to have traveled from A4 to inside the turn in 2 minutes at a

speed in excess of 25 knots, which was not possible. MSJ p.10 ¶53, A.R. v. II Tab 106. In

response to this argument, the ALJ rejects the reliability of the Header log when he responded to

Respondents' Proposed finding of fact H-4 at A.R. v. II, Tab 106**,** p. 48 reads as follows:

> The Header Log demonstrates that after completing the turn, *SPENCER* was about 50
> yards inside of the Restricted Gear Area moving parallel to the boundary in a southerly
> direction. Exhibit 41 at Fig. 3.

---

[2] Plaintiff notes that all time and area calculations are based on the time plots were taken and the straight line
distance between the plots, which assumes the target took the most direct route, a straight line. As the judge and
various witnesses noted, vessels seldom navigate around points in straight lines, hence the paths are more often
longer, meaning they cover more distance. As such, speed estimates are conservative.

**RULING.  REJECTED.**  The exact location of the SPENCER in the Restricted Gear Area is unknown.  [Internal Citations Omitted]

The judge explained this ruling t when he further ruled at H9 as follows:

9. Clearly, *SPENCER* was not moving parallel to the track line between the 2158 (A-4 to 2208 (A-5) radar locations, nor was it far enough inside of the gear area to follow down behind such a purported target.

**RULING: REJECTED.** The overwhelming weight of the evidence shows the F/V SETTLER was plotted up to seven-tenths of a mile inside Restricted Gear Area I at 2140, and then again at 2147, 2152, and 2158. The evidence shows that the SETTLER was .66 nautical miles inside Restricted Gear Area 1 at 2158, and the vessel was still inside Restricted Gear Area I at 2200. Thus, the SPENCER must have been further inside the Restricted Gear Area to come around the *F/V* SETTLER around 2200. [Internal Citations Omitted]

In effect, the ALJ finds that SPENCER rounder SETTLER at 22:00 but moves the track of the SPENCER from where the Header Log places it to conform to his presumed guilt of the SETTLER.  The Header Log provides indisputable evidence, but the ALJ acted arbitrarily and capriciously by rejecting it.  For example, in response to Plaintiff's request for ruling 8 at A.R. v. II at Tab 106, the ALJ replied:

"8.  Because the *SPENCER* was near the western boundary of RGA1 after completing its turn to a southerly course at 2202, one can only conclude that the *SETTLER*, being off its starboard bow, would also have to be outside the Restricted Gear Area.

**RULING: REJECTED.**  The actual time that the SETTLER departed the Restricted Gear Area I is uncertain.  However, the evidence shows that at 2158 the SETTLER was inside Restricted Gear Area I and, at 2200, the vessel was still inside Restricted Gear Area I. The record further establishes that at 2208, the SETTLER was just barely outside of Restricted Gear Area I.  Based on the evidence, the SETTLER was most like still inside Restricted Gear Area I at 2202."

The uncontroverted evidence is that the SPENCER's DGPS position was mechanically logged minute by minute in the Header Log.  MSJ p.5 ¶10, and those DGRPS positions served as the reference points from which all plots, such as A1 to A5, are referenced.  MSJ p12, ¶62.  The Header Log records of the SPENCER's position as determined by its DGPS, truly is the cornerstone of the case.  The SPENCER's position was known at all times within one minute, as accurately plotted by Ouellette and Peterson and the ALJ and Agency arbitrarily and capriciously choose to ignore the evidence.

As noted below, the ALJ accepted the Agency's Exhibit 16, reproduced as Attachment D, hereto as showing the course and apparent meeting aspects of the SPENCER and the radar target at the crucial time of 21:58 to 22:08 when the SPENCER claims to identify the radar target as SETTLER. A.R. v. II at Tab 106. Agency Exhibit 16 shows the SPENCER turning at 21:58, assuming an easterly course until 22:08. Exhibit 16 is missing the northeast course of the SPENCER from 21:58 through the entire turn of the SPENCER taken at 22:01 to 22:02, in clear contradiction to the Header Log. It was offered by the Agency to prove the closing aspects of the vessels on essentially a reciprocal course, based on their presumed courses.

A real evaluation of the Agency's own evidence shows that the observations of the SPENCER's crew are entirely inconsistent with the Agency's claimed course of the SETTLER. See Report of Gerald A. Ouellette, Agency Exhibit 41.[3] Captain Valente's claimed course from his 21:30 start point outside RGA1 and continuing southerly along the RGA1 border is the only explanation of SETTLER's course leading up to the SPENCER rounding SETTLER at 22:00 consistent with the testimony of the Agency witnesses as demonstrated by the following:

1.    From 21:47 until the vessels passed starboard to starboard at, or just before, 22:00 the vessels closed with a slightly changing bearing shift to the right and a decreasing range-a classic intercept- as the SPENCER closed and prepared to round behind the SETTLER and come along her starboard side. The steady course of the SPENCER to the SETTLER is confirmed by the Header Log which shows the SPENCER made no course alterations from 21:47 to 22:01, and the testimony of the Agency witnesses. MSJ p6 ¶¶14-20, 22, 27-29. In point of fact, the

---

[3] The ALJ rejected plaintiff's expert Ouellette, in part because he tested Captain Valente's alleged course in light of the uncontroverted evidence of the Header Log and the testimony of the Agency witnesses. AR v. II at Tab 106. This Court should carefully review this report, Agency Exhibit 41, as it fully calculates the speeds necessary to get between the various radar plots and shows the approaching angles of the two vessel-purely mathematically. However, since it disproves the Agency's case the ALJ rejects the opinion out of hand as being unscientific. In

helmsman brought the SPENCER precisely astern of the SETTLER and rounded her as intended. MSJ p.11 ¶59.  The only inconsistency in the meeting was that at 21:58 the radar target was 2600 yards away and should not have been reached for five minutes. MSJ p.8 ¶¶30-35.  Because the SETTLER was closer than the radar target, it was passed sooner[4].

2.    At 21:52, the radar target supposedly moved from location A2 to A3, which would have required a change in course so that the targeted vessel had swung her bow towards the SPENCER through to the point that her port or red light would have been visible for at least five minutes, showing her red light and the SPENCER would no longer have been on an intercept course.  MSJ p.7 ¶19.  The radar target could not have been in sight of the SPENCER during this maneuver.  It is inconceivable that the crew of the SPENCER, closing at night at 15 knots on a target whose green navigation lights were visible, would not have noticed that the target had changed direction and for five full minutes, showed its red light rather than green, and was moving east to west as the SPENCER approached from the Southeast.  The Agency witnesses' testimony is only consistent with a vessel moving constantly in a relative fashion from SPENCER's left to right.  MSJ p.7 ¶20.  In effect, for the crew to have been watching the lights of a vessel and not to have seen the changes in aspects that the movement of the radar target would have made, proves that they were not watching the radar target.

3.    At 21:47, the bearing to plot A4 was approximately 8 degrees, but at 21:58, the SPENCER was still aiming for the lighted fishing vessel on her same course and the radar target,

---

point of fact, the opinion is not based on scientific theory-it is based on simple geometry, math and rules of navigation.
[4] The method of approach, watching the bearing drift of another vessel, does not require accurate range, as the relative motion of the vessels ensures they will not collide, as opposed to a constant bearing, decreasing range.

A4 was now 33 degrees off of her starboard bow.  MSJ p.6 ¶17.[5]  The bearing to the radar plot was changing, but the bearing to the lights was not.  MSJ p.7 ¶20.

4.      The radar target at 21:58 was 2600 yards distant from SPENCER, and at the SPENCER's reported speed of 15.7 knots should not have been passed for five minutes, based on simple mathematics. MSJ p.8 ¶¶30-35.  The SPENCER, however, passed the SETTLER starboard to starboard at 22:00 and executed her turn at 22:01 to 22:02, passing SETTLER three minutes before SPENCER would have encountered the radar target.  MSJ p.8 ¶29.  For two vessels 2600 yards apart at 21:58 to have passed two minutes later at 22:00, they had to close at 35.51 knots, meaning the SETTLER would have had to have covered 1600 yards in the same time SPENCER covered 1000 yards,  had to be moving at close to 20 knots, well beyond the theoretical top speed of the SETTLER.  MSJ p.8 ¶31.  If, however, the SETTLER had commenced a trawl from the location Captain Valente claimed, at her normal trawl speed of 2-3 knots, she would have passed the SPENCER, starboard to starboard at approximately 22:00.  See Ouellette Report,  A.R. v. V. Exhibit 41.

5.      At 22:01 to 22:02, the SPENCER executed a145 degree turn to starboard, came around behind SETTLER and paralleled SETTLER's course, on a heading of 177 degree  true, almost due South.  MSJ p.9 ¶37.  At no time prior to or during the turn, did anyone on board the SPENCER report a change in SETTLER's course.  MSJ p.7 ¶¶26-28.  It is inconceivable that a course change to bring SETTLER from a westerly to a southerly course in such close proximity to SPENCER would have gone unnoticed by SPENCER's crew.  Rather, it is evident that after the SPENCER turned at 22:01 to 22:02 she assumed SETTLER southerly course.  The evidence indicates that the SETTLER was proceeding on a southerly course when intercepted by the

---

[5] Notably, the chart produced from the SPENCER on the night of the incident does not plot A3 or A4, raising the

SPENCER, not on any course that a vessel having traveled from A4 would have followed. The Agency's testimony establishes the vessels on parallel southerly courses for a few minutes before 22:05. MSJ p.9 ¶¶ 37-39. The Header Log established that as the SPENCER was proceeding on the port quarter of the SETTLER, the SPENCER was at most 60 yards inside of the RGA1, running parallel to its direction. Id. The SETTLER had to have been inside of the radius of the SPENCER's turn executed at 22:01 to 22:02 and outside of RGA1. MSJ p.9 ¶¶37, 42-44.

6.    In order to prove that the SETTLER had been in RGA1, the Agency argued and presented evidence that the SETTLER's position was fixed by radar and visual sighting at 22:08 alongside the SPENCER, at position A5. MSJ p.11 ¶60. The Agency's argues SETTLER navigated from A4 to A5. The Agency presented evidence to show that the SETTLER could have transited from point A4 at 21:58 to A5 at 22:08, by speeding up to 5.5 knots by letting out its net cables, as preposterous and impractical as this was.[6] The Agency's strained explanation to apparate the radar target from the A4 plot at 21:58 to the A5 at 22:08 assumed the SETTLER proceeded in a straight line from A4 to A5. The Agency evidence, both the Header log and the testimony of the Agency witnesses establish that the SETTLER passed SPENCER at 22:00, was inside of the SPENCER's turn at 22:01 to 22:02 and to the right of the SPENCER from 22:00 to 22:05, when the track from A4 to A5 was well to the left of the SPENCER. Basic math establishes that since the radar target at A4 could not have gotten inside of the SETTLER's turn without going 26 knots, the SETTLER was never at A4. MSJ p.10 ¶53. The Agency witnesses' testimony and Header Log again contradict the Agency's position.

---

question of whether they were plotted at that time, or that the crew only recorded DGPS positions, range and bearing and plotted them later

In short, the Agency's own evidence supports rather than challenge Captain Valente's testimony, and that the radar target was not the SETTLER**.**  If the Header Log is valid and the Agency witnesses are to be believed, then the SETTLER could not have been in RGA1 at A4.

**V.    THE INCONSISTENCIES BETWEEN AGENCY'S EXHIBITS 16 AND 46 MAKE A FINDING OF RESPONSIBILITY ARBITRARY AND CAPRICIOUS.**

During the course of the hearing, the Agency presented Exhibit 16, Attachment D hereto, to establish the meeting aspects of the SPENCER and the radar track, having witnesses adopt it as indicative of the course of the SETTLER to show how the vessels met, testimony of Diaz Trans. AR v. II. 16-21, 23-24.  The "track" is not the track of the SPENCER but rather a plot of lines drawn between the points where the SPENCER established radar fixes A1-A4.  MSJ p. 6 ¶12, p. 11 ¶54.  It truncates the northeast course of the SPENCER after 21:58 and completely omits the turn of the SPENCER commencing at 22:01 to 22:02.  MSJ p.9 ¶¶37-38.  Despite the fact that Exhibit 16 falsely represents the meeting point of the vessels at the time most crucial to establishing whether the SETTLER had come from point A4 inside RGA1, the Agency relied on it, and not the diagram drawn by its own expert Peterson, Attachment C, which accurately depicted the course recorded by the SPENCER's Header Log.  The Agency's efforts are clearly set forth in AR v. II Tab 106 at Page 45 and #3 of the Initial Decision, which read as follows:

> Agency 16 purports to show a direct intercept of the *SETTLER* by *SPENCER* as if *SETTLER* was emerging from the Restricted gear Area shortly before 2208.
>
> **RULING: REJECTED**
>
> 3. Agency Exhibit 16, which is a magnified reproduction of Agency Exhibit 15 (the 1:400,000 scale chart containing plot of the SETTLER), shows a direct intercept by the SPENCER as the SETTLER was emerging from Restricted Gear Area I."  [Additional Citations Omitted]

Exhibit 16 displays a course that would put the SPENCER on a reciprocal course from a vessel emerging from RGA1.  In effect, the ALJ accepts Exhibit 16 as depicting the intercept,

---

[6] Of course the ALJ and the Agency failed to explain how, given that the cables could only be let out once, the SETTLER could achieve this speed from A4 to A5, as the radar target had already traversed from A3 to A4 at the

despite the undisputed fact that the diagram falsely sets out the course of the SPENCER which is

correctly depicted in the header log.  MSJ p.9 ¶¶37-45.  Given the availability of Petersons'

drawing, Attachment C depicting the true course of the SPENCER, the Agency's use of Exhibit

16 was a transparent attempt to obfuscate the true course of SPENCER and the meeting aspects

of the vessels to conform the evidence to the Agency's desired conclusion.

## VI.    JUDGE MCKENNA'S REJECTION OF PLAINTIFF'S EXPERT GERALD A. OUELLETTE WAS ARBITRARY AND CAPRICIOUS.

This court should carefully review Mr. Ouellette's report and the ALJ's criticism of it.

The report actually offers no "scientific" theories about the navigation of the vessels. A.R. v. V.

Agency Exhibit 41.  Mr. Ouellette's plots of the course of the SPENCER, the radar plots and the

claimed course of the SETTLER are mere mathematical plots, and are virtually identical to the

plot done by the Agency expert, Benjamin Peterson.  A.R. v. V Agency Exhibit 46.  The Court

rejects Mr. Ouellette's report, for example, Finding D3 at A.R. v. II at Tab 106:

> 3. Put another way, with reference to Agency Exhibit 16, a radar target moving from:
>
> > a. the 2147 radar point to the 2152 radar point would have appeared to move to the left (to port). Trans. 621 ll. 8-9.
> >
> > **RULING: REJECTED.** There is no reliable and credible evidence to support Mr. Ouellette's testimony and theory. [Internal Citations Omitted]

Experts should consider all claims of the parties, not reject anything merely because one

side or challenges it, particularly where the meeting aspect of vessel on known courses are

matters of fact, and not conjecture.  Indeed, when the ALJ was asked by Plaintiff's request for

finding D6 to accept Mr. Ouellette's plot of the SPENCER's header log, the ALJ criticizes Mr.

Ouellette's attempt to consider Captain Valente's position at A.R. v. II at Tab 106:

> 6. The inaccuracy of Agency 16 is demonstrated by the best evidence, that is, the *Spencer's* header log as plotted by Respondents' expert Ouellette. That plot is based upon the *Spencer's* own

same speed.

internally-generated digital GPS data which shows a course for the *Spencer* materially at odds with the course depicted on Exhibit 16, but consistent with CDR Diaz's testimony.

**RULING: REJECTED**. Professor Ouellette's plot is not the best evidence. Professor Ouellette's heavy reliance on the manually inputted 2130 waypoint position is misplaced. There is no corroborating evidence that Respondent Valente began his 2130 trawl at the waypoint position manually inputted in the F/V SETTLER's plotter. The fact that the GM1 Chicoine checked the fish plotter and observed the 2130 waypoint does not validate or otherwise substantiate Respondent Valente's claim that he commenced his trawl at the waypoint position. The record establishes that positions plotted on Agency Exhibit 16, which is a magnified reproduction of Agency Exhibit 15 (the 1:400,000 scale chart containing plot of the F/V SETTLER) was based on the mechanical radar fixes. The exhibit was created by connecting the plots and may not represent the actual turns made by the F/V SETTLER as depicted in the various Agency exhibits. However, Agency Exhibit 16 adequately represents the various positions of the F/V SETTLER on the evening of October 16, 1997. This is especially true given the fact that Coast Guard reports and testimony, as well as other documentary evidence, shows that the USCGC SPENCER and the F/V SETTLER were in close proximity to one another around 2201. [Internal Citations Omitted]

Exhibit 16 contradicts the header log, and Mr. Ouellette's and Dr. Peterson's plots accurately map it.

Notably, the Agency engaged Peterson and reportedly attempted to retain other experts, but offered no analysis to show how SETTLER is supposed to have navigated from A4 to the positions she was observed at by the crew of the SPENCER at the time of the SPENCER'S turn. The Agency and the ALJ merely conclude that since a vessel was detected in the closed area and SETTLER was nearby, SETTLER was guilty, and any evidence offered to dispute this conclusion, including the basic rules of time and distance, was unreliable.[7]

## VII.    THE ALJ REFUSED TO APPLY THE *DAUBERT* STANDARD RESULTING IN LEGAL CONCLUSIONS THAT ARE CONTRARY TO LAW OR PRECEDENT.

Judge McKenna held that the evidentiary standard for experts as set forth in <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 113 S.Ct. 2786 (1993) and as expanded in <u>Kumho Tire Co. v. Carmichael</u>, 118 S.Ct. 1167 (1999), would not govern expert testimony in this matter. In a

---

[7] On the other hand, the ALJ accepted the testimony of Dr. Setterstrom as the basis for concluding that the SETTLER could make 5.5 knot speed runs, when he, himself, stated he could only speak theoretically, as he had no knowledge of the SETTLER or her characteristics. Once again, the ALJ and the Agency reject without any rational explanation all evidence that conflicts with their conclusions, without evaluating them at all.

separate decision of <u>Lobsters, Inc, NE980310FM/V</u>, in determining that the <u>Daubert</u> standard as extended in <u>Kumho</u> would apply, Judge Bladen stated that "the Supreme Court made clear that all expert evidence must be demonstrated by the offering party to be reliable <u>otherwise it should be excluded</u>."   <u>See</u>, November 16, 2000 Decisions in <u>Lobsters, Inc.</u> (emphasis added). Judge McKenna's ruling misconstrues the precedent regarding expert witness testimony that was established by <u>Daubert</u> and <u>Kumho</u>, which both require that expert evidence be excluded if it is not found reliable. Under <u>Daubert</u> and <u>Kumho</u>, it is the Judge's duty to act as a gatekeeper to ensure that expert testimony is both relevant and reliable.   It was clearly an error of law for Judge McKenna to shirk his gate keeping, responsibility in this manner by refusing to apply the <u>Daubert</u> standard.   Carl Setterstrom and Marine Officer Neelon's testimony should have been excluded because they clearly, by their own admissions, lack the knowledge and expertise to give the opinions they gave, which were heavily relied upon heavily by Judge McKenna to establish SETTLER's clamed course and speed.  (See transcript page 826 and 820, Setterstrom).

**VIII.  THE EVIDENCE OFFERED TO SUPPLEMENT THE RECORD CONFIRMS THAT ANOTHER VESSEL WAS THE RADAR TARGET IN RGA1**

Although the Agency challenges the CIC document annexed to Plaintiff's motion to Supplement the Record, it was produced by the Agency on a Friday night three days before the first hearing as evidenced by the date of the fax cover sheet  SMJ p.12 ¶¶67-71 and constitutes an admission of a party.  CIC was supposedly tracking the SETTLER away from the bridge crew on their own radar consoles, but no evidence of the CIC track(s) was(were) introduced at hearing, no CIC personnel were identified as witnesses and all Agency witnesses either denied the existence of, or at least knowledge of the existence of, radar plots other than those produced for A1-A5.  The document bears the date of October 16, 1997, a time of 10:19 and refers to the

SETTLER and the CIC designation for the SETTLER's track, No. 8174, assigned at 21:05 on October 16, 1997 and gives a different range and bearing to the SETTLER than A1-A5. SMJ p.12 ¶¶67-71. Since the SETTLER called into the NOAA days at sea system prior to departing port on the morning of the 16th, the only time it was tracked was during the evening, and the unique CIC number 8174 was assigned at 21:05 on the night of October 16, 1997, it is fair to assume the time refers to 10:19 PM or 22:19. At 22:19 (10:19 PM) SETTLER was actually alongside the SPENCER. SMJ p.13 ¶77, and target detected at a range of 1.4 nm bearing 131, was not the SETTLER. CIC ascribes a course and speed for this contact as 173 degrees plot, the same course assigned by COMDAC to A4, See Attachment E and Attachment 1 to Affidavit of Gerald A. Ouellette. in Support of Plaintiff's Motion To Supplement. The contact moving from A3 to A4 had an average calculated speed of 5.5 knots, the same as the contact moving from A4 to the fifth plot. The 10:19 or 22:19 CIC plot shows that the target at A4 continued to move within RGA1. Further confirming the presence of another vessel in RGA1 in this location at this time, the SPENCER departed from its position alongside SETTLER at 22:28 and headed precisely towards this CIC until 23:05. SMJ p.13 ¶¶72-77. See Attachment E. The SPENCER clearly went into RGA1 after this other target, seen by the CIC radar observers. Plaintiff contends that the Court should accept this as supplemental evidence to the record, or alternatively allow plaintiff to take out discovery on this point.

IX.    **THE ALJ ABUSED HIS DISCRETION IN ASSESSING THE PENALTIES RAISING A SUBSTANTIAL QUESTION OF LAW, POLICY, OR DISCRETION.**

The duties and powers of the hearing judge are, among others, "to make the decision in accordance with [NOAA's] regulations and 5 U.S.C. 554-557 . . . ." 15 CFR § 904.204. Section 904.108 further provides that

Factors to be taken in account in assessing a penalty, depending upon the statute in

15

2ab4181598b50a98

> question, may include the nature, circumstances, extent, and gravity of the alleged
> violation; the respondents' degree of culpability, any history of prior offenses and ability
> to pay; and other such matters as justice may require.  NOAA will take into account the
> respondent's ability to pay when assessing a civil penalty for a violation of any of the
> statutes NOAA administers.

See also, 16 U.S.C. § 1858(a), (g).  Section 904.108 is incorporated into Subpart D of the

regulations governing permit sanctions.  See, 15 CFR § 904.300(a). Under applicable statutory

and case law, NOAA is required during the trial to submit evidence of what factors or

information it considered when assessing the penalty amount and permit sanction. See, In the

Matter of: Crowell, 17 O.R.W. 10 (NOAA App. 1995); In the Matter of Dzung Ngoc Nguyen,

1997 WL 1402884 (NOAA 1997). It is then Judge McKenna's obligation to consider what

NOAA reviewed when it assessed the penalty in light of the same factors.  See, In the Matter of:

Dzung Ngoc Nguyen, 1997 WL 1402884 (NOAA 1997).  Judge McKenna acknowledged these

requirements, See, Initial Decision, p. 16 and 19, but chose to increase the penalty, assessing the

penalties de novo, without considering NOAA's evidence regarding its penalty assessment in

light of the factors set out in 16 U.S.C. §1858(a),(g), 15 CFR § 904.108(a), as well as the

mitigating and aggravating factors found in the Penalty Schedule for the Northeast Multispecies

Fishery.  During the hearing, however, NOAA failed to produce any evidence regarding its

penalty assessment or consideration of the mitigating factors found in the Penalty Schedule.

Notwithstanding this failure, Judge McKenna increased the civil monetary penalty and assessed

the permit sanction requested by the Agency.  A.R. v. II at Tab 106.  Each and every factor, both

mandatory and discretionary, identified in the Act, regulations and Penalty Schedule was ignored

or misconstrued by Judge McKenna in assessing the civil penalty and permit sanction. Judge

McKenna did so based primarily on the fact that Captain Valente knew where he was fishing and

the ALJ now determined that Valente had claimed to be outside RGA1, whereas the SPENCER crew believed his stated position was inside RGA1.

### A.    The penalty and permit sanction are too severe for this violation.

With regard to the Restricted Gear Area, under 50 CFR §§ 648.14(a) (98), 648.81(j)(1) fishing vessels are prohibited from fishing in areas with mobile gear during the time periods specified in 50 C.F.R. §648.81(j) (2). The purpose for implementing 50 CFR §§ 648.14(a) (98), 648.81(j)(1) is to eliminate gear conflict. There is no conservation purpose to this regulation, and it is unclear what incentive any fisherman would have to violate the regulation. Rather than achieve a large catch of fish, mobile gear vessels venturing into their area are more likely to cause damage to their gear, as well as fixed the gear of others.

### B.    The History and Detail of prior offenses.

Judge McKenna fails to differentiate between Respondent Manuel Valente's prior enforcement history and Respondent Frontier Fishing Corp.'s prior enforcement history. A.R. v. II at Tab 106. Judge McKenna failed to consider that this was a first offense for Manuel Valente and apparently incorrectly counted the prior history of Frontier Fishing Corp. against Respondent Valente. Judge McKenna does this despite the fact that on page 2 of the Initial Decision Finding of Fact #2 clearly sets forth that Captain Valente has no prior enforcement history. Id. The enforcement history of Frontier Fishing Corp. cannot count against Respondent Valente. Id.

Further, Judge McKenna makes note of a 1993 violation of Respondent Frontier that he acknowledges cannot be used in assessing the penalty. Id. Judge McKenna looked back eight (8) years from the date of violation to uncover a violation that could not count as a prior offense. Id. However, he failed to consider or make note of the mitigating factor that in the six (6) years

17

since this alleged violation, there have been no further charges or actions levied against either

Respondent.   Accordingly, Judge McKenna's analysis of Petitioners prior history is clear error

and cannot form the basis for assessing such severe penalties and sanctions.

### C.    As Justice May Require:  Decrease In Days-At-Sea Allocation.

NOAA's regulations require that it submit evidence during the trial of the factors and

information it considered when it assessed the penalties.  See, 15 CFR § 904.108; 16 U.S.C.

§1858(a), (g); 50 CFR § 648; Court's May 7, 2001 Decision.  As stated previously, included in

the "as justice may require" factor are the mitigating and aggravating factors delineated in

NOAA's Penalty Schedule. It was then Judge McKenna's obligation to consider what NOAA

reviewed when it assessed the penalty in light of the same factors.  See, In the Matter of: Dzung

Ngoc Nguyen, 1997 WL 1402884 (NOAA 1997).   Judge McKenna's decision to assess the

penalties de novo, did not relieve NOAA of its burden to comply with the mandates of 16 USC §

1858, 15 CFR § 904.108(a) and the Penalty Schedule.  There is nothing in the record to

substantiate such extraordinary harsh penalties and sanctions.  Moreover, Judge McKenna states

in his Initial Decision that he is required to take into consideration the various factors set forth

under the Act, the regulation, and Penalty Schedule.  A.R. v. II at Tab 106.  Nonetheless, Judge

McKenna turned a blind eye toward NOAA's evidentiary failings to provide evidence regarding

each of those factors, and further, ignored any factors that weighed in favor of Petitioners.

### X.    AGENCY'S PENALTY ASSESSMENT LACKS UNIFORMITY, CLEARLY ERRONEOUS, CONTRARY TO NOTIONS OF DUE PROCESS, AND RAISES AN IMPORTANT QUESTION OF LAW, POLICY OR DISCRETION.

As the United States Supreme Court stated "[w]hile the legislature may elect not to

confer a property interest . . . , it may not constitutionally authorize deprivation of such an

interest once conferred, without appropriate procedural safeguards. . . . the adequacy of statutory

procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms." Vitek v. Jones, 445 U.S. 480, 491 (1980)(citations omitted).  As stated previously, NOAA (and, here, Judge McKenna) is bound by several rules and regulations, including the Penalty Schedule, when assessing penalties.  As stated in a 1995 memorandum from Michael Kuruc, Assistant General Counsel for NOAA Enforcement and Litigation, the Penalty Schedule "has two equally important goals: the assessment of individualized penalties and the establishment of relative uniformity in penalties assessed for similar violations." See, Kuruc, M. *Consideration of Prior Violations in the Assessment of NOAA Civil Administrative Penalties*, May 10, 1995, p. vi (emphasis added). "Further, for purposes of considering prior violations, it is NOAA's practice to include only those final administrative decisions going back 5 years before the date of violation of the subsequent offense." See, id. (emphasis added).  Judge McKenna notes past violations, which could not be considered.  A.R. v. II at Tab 106.  The purpose and intent of that notation is unclear.  What is clear is that Judge McKenna failed to review the record of discovery of all Restricted Gear Area cases that had been prosecuted of the five other cases involving Restricted Gear Area violations (copy of Discovery attached as Attachment 9).  Two resulted in written warnings; one resulted in $5,000.00 forfeited for the catch.  The two remaining violations occurred more than three years after the SETTLER case which involved the destruction of fixed gear and settled for less than Judge McKenna assessed against Respondents.  Moreover, Judge McKenna's assessment is anything but uniform with similar cases, or for that matter, with cases wherein more outrageous violations occurred.

**XI    THE ALJ HAS SANCTIONED THE WRONG FISHING PERMIT.**

On page 3 of the Initial Decision #5, ALJ McKenna makes a finding that Respondent, Frontier Fishing, Corp., holds a monkfish permit. The violation in this action occurred while engaged in monk fishing. Thus, the sanction should have been against the monkfish permit.

## XII     <u>CONCLUSION</u>

There is no genuine issue that the ALJ and Agency's acted arbitrarily and capriciously in concluding that the F/V SETTLER was inside RGA1 on the night of October 16, 1997. At no time were the vessels in a position where the SPENCER crew actually observed the SETTLER while it was inside RGA1. It was impossible for the SETTLER to have moved from target point A4 to where the vessels met at 22:00 or 22:01. New evidence that the Agency arbitrarily and capriciously refused to consider prior to and at the hearing below, and refuses to consider in this proceeding establishes that the targets plotted in RGA1 were another vessel and that this other vessel continued to be plotted by the SPENCER's crew after the SETTLER was approached close by. Accordingly, this Court should reverse the Agency's decision below and enter an order awarding Plaintiff its fees and costs in accordance with the Equal Access to Justice Act, together with such further relief as this court deems just and proper.

Respectfully submitted this 7th day of April, 2005
**FRONTIER FISHING CORP, by its attorney**
*/s/ Stephen M. Ouellette*
Stephen M. Ouellette, Esquire
BBO No.: 543752
David S. Smith, Esquire
CIANCIULLI & OUELLETTE
163 Cabot Street                              Tel:  (978) 922-9933
Beverly, MA 01915                          Fax:  (978) 922-6142



**Attachment A.**
Diagram 3 to Plaintiff's Expert Report of Gerald A. Ouellette
Line to left of 70 11' line is western border of RGA1
Red Line (starting at bottom left at 21:40) Represents SPENCER course as plotted from Header Log
Blue Line (Starting towards top of diagram at 21:30) shows Captain Valente's claimed course of SETTLER
Green line (Starting at upper right at 21:40) shows Agency's claimed course of target in RGA1 from 21:40 to 21:58



**Attachment B.**

 Figure 8 to Ouellette Report, magnified detail of Ouellette Magnified detail of Figure 3 and time marks interpolating position of target moving from A4 to A5 based on average speed.



Attachment C.

     Agency's Expert Dr. Peterson's drawing showing plot of SPENCER's course form Header Log (starting at lower left of drawing at 21:57) and Agency's claimed course of SETTLER from A4 to A5 (starting at upper right of drawing at 21:58) with positions along A4 to A5 linen extrapolated based on average speed of an object moving from A4 at 21:58 to A5 at 22:08.



**Attachment D.**

     Agency Exhibit 16. Straight line depicting SPENCER course form 21:58 to 22:08,a s opposed to course plotted By PEterosn above from Header Log and by Ouellette plotted in Attachment A, also from Header Log.



Data between the radar target points within Gear Area 1
2140 to 2147: 0.309 nm, 7 min, 2.65 knots
2147 to 2152: 0.285 nm, 5 min, 3.42 knots
2152 to 2158: 0.506 nm, 6 min, 5.06 knots
2158 to 2219: 1.917 nm, 21 min, 5.48 knots

**Attachment E.**
Exhibit A to Affidavit of Gerald A. Ouellette submitted in support of Plaintiff's Motion to Supplement Record
Same as Figure 3, Attachment A above, with notations of course and adding fifth plot inside RGA1 with assumed
course of target.