# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

FRONTIER FISHING CORP.,     )
                                 )
            Plaintiff,      )
    v.                    )
                                 )     CIVIL ACTION
DONALD EVANS, Secretary of the  )
UNITED STATES DEPARTMENT OF  )     NO. 04-11171-DPW
COMMERCE; and CONRAD C.      )
LAUTENBACHER JR., Under Secretary  )
for Oceans and Atmosphere / Administrator, )
                                 )
           Defendants.     )
_____ )

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO AFFIRM THE DECISION OF
## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATIONS'
## AND IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Plaintiff contends that, as a matter of law, the National Oceanic and Atmospheric

Administration's (hereafter, "NOAA"s) decision to impose sanctions for fishing in a prohibited

area, October 16, 1997, lacked a reasonable basis in fact.   The sanctions were imposed by

NOAA in connection with the mission of the Magnuson-Stevens Fishery Conservation and

Management Act (hereafter, "Magnuson-Stevens Act"), 16 U.S.C. §§ 1801 *et seq*., to "conserve

and manage the fishery resources found off the coasts of the United States."  Pursuant to the Act,

NOAA is authorized to promulgate regulations to further the goals of the Act.   The regulations

make it "unlawful for any person to . . . fish, or be in the areas described in § 648.81(j)(1) . . . on

a fishing vessel with mobile gear . . . ." from October 1 to June 15 each year.  50 C.F.R.

§ 648.14(a)(98).  Section 648.81(j)(1) establishes the boundaries of Restricted Gear Area I

(hereafter, "RGA I").   The regulations are enforced jointly by NOAA and the United States

Coast Guard.  18 U.S.C. § 1861(a).

After a formal, trial-type hearing, a NOAA Administrative Law Judge (hereafter, "ALJ")

found that Plaintiff was fishing in RGA I with mobile fishing gear.  The area where the violation occurred, 60 miles south of Nantucket in the Gulf of Maine, is by regulation a restricted fishing area where fishing with mobile fishing gear is prohibited.  50 C.F.R. § 648(a)(98); 648.81(j). Mobile fishing gear is gear that is attached to a moving fishing vessel, in contrast to fixed gear such as lobster pots.  50 C.F.R. § 648.2.

The administrative record is replete with evidence, visual and technical, that Plaintiff was fishing in restricted waters.  Accordingly, the principles of administrative law preclude the result sought by Plaintiff in this action, and Plaintiff's motion for summary judgment must be denied.

## II.     PROCEDURAL HISTORY

The Plaintiff, Frontier Fishing Corporation, and Captain Manuel Valente (not a party to this appeal), were charged jointly and severally, with violating the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq*., and regulations promulgated thereunder, 50 C.F.R. § 648.14(a)(98).   The case was heard in a trial before an ALJ on August 14 and 15, 2001, and on November 19 and 20, 2002.  On August 5, 2003, the ALJ issued a Decision and Order finding that the Agency "proved by a preponderance of evidence that Respondents unlawfully fished in RGA I in violation of the Magnuson-Stevens Act and the underlying regulations codified at 50 C.F.R. Part 648."  Vol. II, Tab 106.  The ALJ assessed a joint and several civil penalty of Thirty-Five Thousand Dollars ($35,000).  Id.  In addition, the Judge suspended the F/V Settler Captain's Federal Fisheries Operator's Permit for a period of Thirty (30) days.  Id.  The ALJ also suspended Frontier Fishing Corporation's Scallop Days-At-Sea Allocation for a period of Thirty (30) days.  Id.  Respondents filed a Petition for Review.  Vol. II, Tab 111.  On May 3, 2004, the Administrator issued an Order Denying Discretionary Review.  Vol. II, Tab 114.

## III.    THE  MATERIAL FACTS

As noted in Defendant's Opposition to Plaintiff's Motion to Supplement the Administrative Record, at 2-5, the facts of this case are found in the evidentiary record compiled

by the agency, filed with the Court and served on Plaintiff at the time that the Answer was filed. The facts in the Administrative Record supporting the agency's finding of violations by Plaintiff on October 16, 1997, are as follows:

1.      On October 16, 1997, Frontier Fishing Corporation owned and operated the Fishing Vessel Settler (hereafter, "F/V Settler").  Vol. III, Tab 115, TR 158 at 10-17.

2.      On October 16, 1997, the F/V Settler had its fishing gear in the water and was engaged in fishing, as defined by the Magnuson-Stevens Act, throughout the time period of 2130 to 2208. Vol. IV, Tab 116, TR 559 at 8–18.

3.      The F/V Settler's radar positioning system was functioning properly on the evening of October 16, 1997.  Id., TR 518 at 24-25, and 519 at 1-12.

4.      NOAA regulations prohibit the use of mobile gear in RGA I.  Vol. V, Tab 117, Agency Ex. 7.

5.      The United States Coast Guard Cutter Spencer ("USCGC Spencer") picked up a radar signal of a vessel at approximately 2105.  Vol. V, Tab 117, Agency Ex. 19.

6.      The Coast Guard officers on the USCGC Spencer saw a white light moving on the horizon.  Shortly thereafter, the officers were able to distinguish green over white lights.  Vol. III, Tab 115, TR 39 at 7-17.   Green over white lights on a vessel indicate a fishing vessel trawling at night.  Id.; Vol. V, Tab 117, Agency Ex. 13.

7.      From the time of first visual contact through interception of the vessel, the USCGC Spencer maintained continuous visual and radar contact with the vessel.  Vol. IV, Tab 116, TR 864 generally.  There was clear visibility throughout the operation.  Vol. V, Tab 117, Agency Ex. 12, 43.

8.      At 2140, the USCGC Spencer plotted movement of the vessel over a half a mile inside RGA I. Vol. III, Tab 115, TR 44 at 23-24 and 62 at 2-3; Vol. V, Tab 117, Agency Ex. 14, 16.

9.      At approximately 2150, the USCGC Spencer altered course and turned to port to

3

intercept the vessel.  Vol. V, Tab 117, Agency Ex. 19.

11.     At 2147, the USCGC Spencer plotted the vessel inside RGA I.  Vol. V, Tab 117, Agency Ex. 14, 16.

12.     At 2152, the USCGC Spencer plotted the vessel inside RGA I. Vol. V, Tab 117, Agency Ex. 14, 16.

13.     At 2158, the USCGC Spencer plotted the vessel inside RGA I.  Vol. V, Tab 117, Agency Ex. 14, 16.

14.     Commander Diaz of the USCGC Spencer verified each of the 2140, 2147, 2152 and 2158 positions taken by the USCGC Spencer, both visually and on the radar screen.  Vol. IV, Tab 116, TR 864 at 7-9.

15.     At approximately 2200, while the vessel was still in RGA I, Commander Diaz was able to see that the F/V Settler had its fishing gear in the water.  Vol. V, Tab 117, Agency Ex. 19.

16.     At approximately 2205, the USCGC Spencer hailed the vessel.  Id.

17.     At approximately 2205, the USCGC Spencer began video taping the vessel.  Vol. III, Tab 115, TR 146 - 148 generally.

18.     At approximately 2205, the vessel responded to the USCGC Spencer's hail and identified itself to the U.S. Coast Guard as the F/V Settler.  Id.

19.     At 2208, the USCGC Spencer intercepted the F/V Settler just outside of RGA I.  Vol. V, Tab 117, Agency Ex. 19.

20.     At 2248, the Captain of the USCGC Spencer made the decision to board the F/V Settler. Vol. V, Tab 117, Agency Ex. 19.

21.     At 2257, the boarding party from the USCGC Spencer departed for the F/V Settler.  See Vol. V, Tab 117, Agency Ex. 26.

22.     The F/V Settler captain, Manuel Valente, admitted to U.S. Coast Guard officers on board his vessel and at the ALJ at hearing that the Settler was fishing during the time period between 2130 and 2208 on October 16, 1997.  Id; Vol. IV, Tab 116, TR 559, at 8-18; Vol. II, Tab 89, ¶

4

10.  While on board, the U.S. Coast Guard saw the fishing gear being operated.  Vol. V, Tab 117, Agency Ex. 26.

23.    The F/V Settler was fishing at all times between 2130 and sometime after 2300 when the S/V Settler hauled its fishing gear back into the board, in the presence of the U.S. Coast Guard boarding team.  Id.

## IV.    SCOPE AND STANDARD OF REVIEW

Judicial review of agency action is governed by the Administrative Procedure Act, 5 U.S.C. § 706, which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – unsupported by substantial evidence." 5 U.S.C. § 706(2)(E).  This is a narrow scope of review.  All of the relevant facts are contained in the administrative record, and there are no facts in dispute because the agency has already determined them.  Summary judgment may be employed but the court does not resolve issues of fact.  Florida Power & Light v. Corion, 470 U.S. 729, 743-44 (1973).  See Maine v. Norton, 257 F. Supp. 2d 357, 363 (D. Me. 2003) (same).   The First Circuit has explained the standards for evaluating a summary judgment motion in connection with review of an administrative decision. If the agency action is supported by "substantial evidence," it may not be overturned. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolo v. Federal Maritime Commission, 383 U.S. at 620; Southwestern Bell Mobile Sys. v. Todd, 244 F. 3d 51, 58 (1st Cir. 2001).

> Congress was very deliberate in adopting this standard of review. It frees the reviewing courts of the time consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute.  These policies are particularly important when a court is asked to review an agency's fashioning of discretionary relief.  In this area agency determinations frequently rest upon a complex and hard-to-review mix of considerations.

Consolo v. Federal Maritime Commission, 383 U.S. at 620-21.  See also Steadman v. SEC, 450

U.S. 91, 99 (1981) (citing Consolo v. FMC, 383 U.S. 607, 620 (1966)); Bath Iron Works Corp. v. United States Dept. of Labor, 336 F.3d 51, 56 (1st Cir. 2003); Chritton v. National Transportation Safety Board, 888 F.2d 854, 856 (D.C. Cir. 1989)(court determines whether the agency "could reasonably find the facts as it did.").  See Roche v. Evans, 249 F. Supp.2d 47, 57 (D. Mass. 2003) ("Under the familiar standard, substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" in NOAA case).   In addition, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Penobscot Air Services, Ltd. v. FAA, 16 F.3d 713, 718 (1st Cir. 1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951)).  See Anderson v. Evans, 314 F.3d 1006 1018 (9th Cir. 2002) (when the record reveals that an agency based a finding upon relevant and substantial data, the fact that the record also contains evidence supporting a different scientific opinion does not render the decision arbitrary and capricious).

The actions of the ALJ in evaluating NOAA's case in the administrative proceeding must be based on the whole administrative record or those parts thereof that are supported by and in accordance with reliable, probative, and substantial evidence.  5 U.S.C. § 556(d).  Camp v. Pitts, 411 U.S. 138, 142 (1977); Universal Camera Corp. v. NLRB, 340 U.S. at 487-88 ("the record in its entirety. . . . includes the body of evidence opposed to the agency's view"). Within this context, the burden of proof is on NOAA to prove the counts to the ALJ by a preponderance of the evidence.  See Department of Labor v. Greenwich Colleries, 512 U.S. 267 (1994); Steadman, 450 U.S. at 100-03.[1]

Finally, the agency's determinations regarding scientific and technical matters require

---

[1] "The ALJ's decision turns in large part on his assessment of the credibility of the witnesses," an administrative decision that must be afforded great deference.  Loga v. Daley, 2002 WL 188401 *10 (E.D. La.). "Nothing about the agents' testimony was inherently incredible or unbelievable, and therefore the ALJ was entitled to credit their testimony/word over [the Respondent's] protestations of innocence."  Id. at *13 (NOAA enforcement case)..

deference.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103, 112 (1983) ("When examining this kind of scientific determination . . . , a reviewing court must generally be at its most deferential.").

## V.    THE ADMINISTRATIVE RECORD HAS SUBSTANTIAL EVIDENCE SUPPORTING THE VIOLATION

On October 16, 1997, the USCGC Spencer, while on routine patrol, encountered the F/V Settler as it was fishing with mobile gear in RGA I.  At approximately 2105, USCG Ensign Toomey, an officer on the deck for the 2000 to 2400 bridge watch, notified Lieutenant Commander Charley Diaz of a radar contact off the port bow.  Vol. V, Tab 117, Agency Ex. 19. Commander Diaz verified the radar reading for himself.  Id.  Shortly thereafter, the lookout reported the contact visually on the horizon.  Id.  Commander Diaz stated, "At first only a white light was reported, but as we got closer, the lookout was able to distinguish green over white lights.  I used my binoculars to personally confirm the lookout's report and saw green over white as well.  These lights indicated a fishing vessel 'trawling' at night."  Id., Vol. V, Tab 117, Agency Ex. 13.

Meanwhile, Quartermaster Matthew Coppola ("QM Coppola") had begun a radar contact log and coordinated a "series of fixes for our own position, coupled with concurrent radar ranges and bearings … which all plotted inside the restricted gear area I."  Vol. V, Tab 117, Agency Exhibit 22.  The first fix taken by the USCGC Spencer was made at 2140 and plotted the fishing vessel inside RGA I.  Id.  The USCGC Spencer "altered course to port to intercept."  Vol. V, Tab 117, Agency Ex. 19.  The USCGC Spencer began to close on the vessel at a high rate of speed to determine whether the vessel was in fact fishing while in RGA 1.  Id.

QM Coppola plotted the vessel in RGA I three more times, at 2147, 2152, and 2158.

Vol. V, Tab 117, Agency Ex. 16; see also Vol. III, Tab 115, TR 65 at 11-15.  At approximately

2200, Commander Diaz saw "cables leading from the after part of the vessel into the water" and

"noted one of the fishing reels (drums) aft did not have a net on it, indicating that the net was in

the water as well."  Vol. V., Tab 117, Agency Ex. 19.  At approximately 2205, the Captain of the

USCGC Spencer directed Commander Diaz to hail the fishing vessel.  Id.  The vessel returned

the call and identified itself as the F/V Settler.  Id.  The U.S. Coast Guard officers boarded the

F/V Settler and saw the fishing gear in the water and engaged in fishing.  Vol. III, Tab 115, TR

70, 236; Vol. V, Tab 117, Agency Ex. 26.

### A.    The Elements of the Violation

The Agency was required to prove by a preponderance of the evidence that the Plaintiff

violated 50 C.F.R. § 648.14(a)(98), to wit, (1) that the F/V Settler was inside RGA I and (2) that

the vessel was fishing with mobile gear at the time.  Vol. V, Tab 117, Agency Ex. 7.  As to the

second factor, the Plaintiff admitted that it was fishing at the time of violation.  Vol. II, Tab 89;

Vol. IV, Tab 116, TR 559 at 8–18.  F/V Settler Captain Valente testified that he began trawling

for fish at 2130 that evening, and did not pull up his nets until after 2300 when the U.S. Coast

Guard had boarded the F/V Settler.  Id.  Commander Diaz observed the fishing gear hanging

from the vessel into the water.  Vol V, Tab. 117, Agency Ex. 19.  So did Coast Guard Boarding

Officer Richard Chicoine.  Vol. III, Tab 116, TR 236.  In view of Valente's admissions,

confirmed by at least two Coast Guard witnesses, substantial evidence exists in the record that

the F/V Settler was engaged in fishing with mobile fishing gear.

Moreover, there is substantial evidence that the F/V Settler was in the RGA I at the time.

The U.S. Coast Guard plotted the F/V Settler in RGA I four times that evening, at 2140, 2147,

2152 and 2158.  The U.S. Coast Guard's evidence is supported by the testimony of five Coast

Guard officers:  Commander Diaz, Quartermaster First Class Coppola, Ensign Toomey,

Gunner's Mate First Class Chicoine, and Gunner's Mate Truax.   The radar data on the vessel's

position provided by the U.S. Coast Guard was verified visually and electronically.  The

electronic (radar) data was confirmed by the Combat Information Center, which monitored the radar system below deck on the USCGC Spencer.

Agency expert Dr. Peterson, whom the ALJ qualified as an expert in navigation systems and vessel positioning based on those navigation systems; Vol. III, Tab 115, TR 263-264; testified that the radar system and other positioning equipment on the USCGC Spencer were functioning normally that night and that the radar signals correctly located the F/V Settler inside the RGA.  Dr. Peterson testified that, in his opinion, there was no possibility that the F/V Settler was operating outside of the RGA I that night.  TR 291-92.  He also testified that the navigation system on the F/V Settler was operating properly at the time.  TR 278.

As noted above, at 2105, the USCGC Spencer first became aware of a radar contact off its port bow.  Vol. V, Tab 117, Agency Ex. 19.  From that point through interception of the F/V Settler, continuous visual and radar contact was maintained with the F/V Settler.  Vol. IV, Tab 116, TR 864 generally.  Throughout the pursuit of the fishing vessel and coordination of the position fixes, the officers on the bridge, especially Commander Diaz, remained alert to assessing the overall situation on the water.  Vol. III, Tab 115, TR 64 at 16 – 23.

### B.    The Phantom Vessel Defense

The primary claim raised by Plaintiff is that there was another vessel on the sea in the restricted area at that time, and that the U.S. Coast Guard mistook the F/V Settler for the other vessel.   However, that claim is baseless.  Commander Diaz testified that he "personally would have gone over to the radar and looked at the radar and gone up a few scales to look at the overall picture to make sure there aren't other contacts out there."  Id., TR 67 at 14–17.  There was no eyewitness testimony at all regarding another vessel and no other vessel identified on positioning equipment.  Had a second radar contact existed, the U.S. Coast Guard records would have reflected that information, and there was nothing at all in U.S. Coast Guard records to support such a claim.  Commander Diaz put it clearly, "The answer is no, there were no other radar contacts and no other visual contacts between the time in question, 2130 to the 2208 time

9

frame.  There was one light and one radar contact."  Vol. IV, Tab 116, TR 861 at 20–23  ( The radar and radio remained turned on throughout the entire operation.  Vol IV, Tab 116, TR 861-63).

Plaintiff claims that another vessel <u>must</u> have been in the area because the F/V Settler was physically incapable of achieving the route and speed detected by the U.S. Coast Guard. Plaintiff's expert witness Goudey's opinion was offered in support of the theory of physical impossibility, based on his conclusions regarding the size of the ship, its maneuverability, the size and functioning of its fishing gear, and conditions at sea.  Vol. V, Tab 117, Agency Ex. 44.

However, Agency witness Setterstrom testified that Goudey's opinion was unfounded and was fatally flawed by his reliance on at least seven unsupported assumptions.  Vol. V, Tab 117, Agency Ex. 44, Vol. IV, Tab 116, TR 805-833.  Setterstrom was qualified by the ALJ as an expert in naval architecture and marine engineering.  Vol. IV, Tab 116, TR 799 at 9-21; Vol. II, Tab 106 at 13. Based on his level of experience in resistance and propulsion in ship speed and in power estimates, he was qualified to render an opinion regarding the capabilities of the F/V Settler and an opinion on the scientific validity of Goudey's opinion.  Vol. II, Tab 106 at 56. Setterstrom testified that Goudey's claim that the F/V Settler was incapable of achieving the locations plotted by the U.S. Coast Guard radar, was not proven by Goudey's testimony.  Vol. IV, Tab 116, TR 802.  In Setterstrom's opinion, Goudey had not "engaged in scientifically rigorous calculations" to reach his opinion.  Vol. IV, Tab 116, TR 802 at 22-25.  Setterstrom demonstrated in detail how each assumption led to greater instability in Goudey's conclusion. Setterstrom's report states, "the cumulative impact of the assumptions is to render Goudey's conclusions meaningless from [an] evidential standpoint."  Vol. V, Tab 117, Agency Ex. 44. The ALJ agreed, stating that the Plaintiff's experts' opinions were "not supported by reliable and credible evidence sufficient to adequately rebut or otherwise discredit evidence resented by NOAA."  Vol II, Tab 106 at 13.   Goudey "clearly did not have sufficient information to reliably determine the capacity and capability of the F/V/ Settler," and was "scientifically flawed.".  <u>Id</u>.

The ALJ determined that Setterstrom's testimony was more credible than Goudey's. Id. The ALJ determined that Goudey chose to rely on assumptions rather than the facts of the boat itself, including not knowing the particulars of the F/V Settler, depth of the water, the particular gear used, or any valid method for calculating the drag of the Settler's trawling system. In short, Goudey could not support his assumptions with underlying facts. Vol. IV, Tab 116, TR 802 at 22 – 25.

In contrast, the ALJ determined that Setterstrom's testimony and report were based on sound scientific principles, and convincingly demonstrated that the F/V Settler was capable of achieving the speeds necessary to attain each position fix documented by the U.S. Coast Guard. Vol II, Tab 106, at 13-14.

NOAA also presented the testimony of Michael Neelon, a State of Maine law enforcement officer assigned to the Marine Patrol Division, and an experienced trawler fisherman, who was qualified as an expert in fishing activities (not as a commercial fisherman, as Plaintiff would have it). Vol. IV, Tab 116, TR at 836-57. Neelon testified that the F/V Settler was fully capable of trawling the route portrayed by the U.S. Coast Guard.

The ALJ, as he had been with the testimony of Goudey, was unconvinced by the testimony and theories advanced by Plaintiff's expert Ouellette. Vol. II, Tab 106 at 36. Ouellette premised his opinion an unverified waypoint inputted by Captain Valente into F/V Settler logs[2] and misconstrued statements by the U.S. Coast Guard. Vol. V, Tab 117, Respondents Ex. 10. Ouellette claimed that the F/V Settler followed a straight line trawl path just outside of RGA I, ignoring the best evidence available, which was the contemporaneously created logs and statements of the bridge officers of the USCGC Spencer, and he recharacterized the evidence to fit his theories. For instance, Ouellette claimed that there was a near-ocean collision (a "2200 encounter") between the F/V Settler and the USCGC Spencer. Vol. II, Tabs

---

[2]The ALJ characterized this very waypoint notation as untrue. Vol. II, Tab 106 at 19.

94, 101, 111.  But neither eyewitnesses[3] nor the records in the case[4] provide any evidence to support the claim and both Commander Diaz and QM Coppola testified that no such event occurred.  Vol. IV, Tab 116, TR 766 at 5-15; Vol. IV, Tab 116, TR 869-70 generally.[5]   The ALJ determined that there was "no reliable and credible evidence to support Mr. Ouellette's testimony and theory."  Vol. II, Tab 106 at 36.[6]

NOAA presented its case regarding Plaintiff's violation by the eyewitness testimony of five U.S. Coast Guard officers on board the USCGC Spencer who witnessed the discovery, track, interception and boarding of the F/V Settler, together with their contemporaneous written reports,[7] on the radar evidence provided by the radar equipment on the deck of the USCGC Spencer and confirmed by the separate radar gear operated by the Combat Information Center (CIC) below the deck, by the testimony of Dr. Peterson regarding the proper functioning of the Spencer radar systems and the reliability of their positioning information, and by the testimony of experts Setterstrom and Neelson that the F/V Settler was capable of operating at a normal speed and making the maneuvers shown by the radar.  The evidence submitted by NOAA was the best, most reliable and clearly sufficient evidence available, and it established Plaintiff's

---

[3] Vols III and IV, Tabs 115-116 generally.

[4] Vol V, Tab 117, Agency Ex. 19, 20, 22, 25-27 and 37; Vol V, Tab 117, Respondents Exs. 3 and 13.

[5] In order to determine that the F/V Settler was outside of the RGA I and was, instead, traveling a straight line just outside the border, the ALJ would have had to determine that there was a near collision between the F/V Settler and the USCGC Spencer.  Vol II, Tab 106 at 15.  The ALJ rejected that scenario.  Id.  "[A] near collision would have caused some excitement aboard the USCGC Spencer and startled everyone.  Such a fact scenario did not happen."  Id.

[6] This is the same expert witness that Plaintiff has proffered to supposedly explain the supposed importance of the unidentified document that is the subject of Plaintiff's Motion to Supplement the Administrative Record.

[7] The Agency presented all of the contemporaneously created records from the USCGC Spencer that document the actions taken by the USCGC Spencer.  Each of the Coast Guard records submitted by the Agency conforms to standard U.S. Coast Guard recordkeeping protocols, is complete, and was easily authenticated.

12

violation of the Magnuson-Stevens Act.  It was the ALJ's prerogative to assess the evidence,
including the credibility of the fact witnesses and expert witnesses, and there was clearly
"substantial evidence" in the record to support his credibility decisions and the agency's
decision.

### C.      The ALJ Applied the Proper Standard in Admitting Expert Testimony

Plaintiff contends that the ALJ erred in admitting the testimony of NOAA witnesses
Setterstrom and Neelon because the ALJ incorrectly applied the Daubert standard, Daubert v.
Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).   However, Plaintiff provides no
reasoning to support its contention.  The ALJ articulated the proper standard for admitting expert
testimony. Vol. II, Tab 106 at 9-10.   As noted, the ALJ qualified Setterstrom as an expert in
naval architecture and marine engineering.  Vol. IV, Tab 116, TR at 799.  Plaintiff errs in
asserting that Setterstrom was qualified as a fisheries expert since neither NOAA nor Setterstrom
claimed that expertise.   Plaintiff was afforded an opportunity to *voir dire* Setterstrom and object
to his qualifications and testimony, but chose not to do either.  Id.  As the ALJ found, Mr.
Setterstrom was eminently qualified to provide opinions as to the capabilities of the F/V Settler
and as to the scientific validity and reliability of Plaintiff's expert witness' opinion on issues
relating to marine engineering and basic scientific principles.  Vol. II, Tab 106 at 13, note 19.
His testimony was clearly reliable, meeting the  Daubert standard, and Federal Rule of Evidence
702 ("FRE 702").  Vol. II, Tab 106 at 9, fn 13.  FRE 702 states that "a witness qualified as an
expert . . . , may testify . . . , if (1) the testimony is based upon sufficient facts or data, (2) the
testimony is the product of reliable principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case."  The Agency established the reliability
of  Setterstrom  --  as well as Neelon – in qualifying them as witnesses.  Vol IV, Tab 116, TR

798-99 and 835-37.[8]  Accordingly, there is no basis whatsoever for Plaintiff's challenge to

NOAA's expert witnesses.

## VI.    THE PENALTY ASSESSED BY THE ALJ WAS WITHIN HIS DISCRETION

Plaintiff contends that the penalty imposed was unlawful because it was higher than the

penalty proposed by NOAA at the outset of the hearing.   It is true that after hearing the

evidence, the ALJ imposed a higher penalty; however, the higher penalty was clearly within his

discretion.   A sanction imposed by an administrative agency is to be reviewed according to the

"fundamental principle . . . that where Congress has entrusted an administrative agency with the

responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to

policy is peculiarly a matter for administrative competence.'" Butz v. Glover Livestock Comm's

Co., Inc., 411 U.S. 182, 185 (1973).  NOAA's choice of penalty is not to be overturned unless

"unwarranted in law or. . . without justification in fact. . . ."  Id. at 185-86.  Moreover uniformity

of sanction is not required.  Id. at 186.  And the employment of a sanction within the authority of

an agency is not invalid in a particular case because it is more severe than sanctions imposed in

other cases.  Id. at 187.  United States v. Internat'l Brotherhood of Teamsters, 170 F.3d 136, 143

(D.C. Cir. 1999) (sanctions may be set aside only if unwarranted in law or without justification

in fact. ).  An administrative law judge does not abuse his discretion by imposing a greater

penalty than the government had sought.  Lovgren v. Byrne, 78 F.2d 857, 867 (3d Cir. 1986).

See also Modern Continental Construction Co. v. OSHA, 305 F.3d 43, 53 (1st Cir. 2002)

(commission's penalty reviewed only for manifest abuse of discretion).

The statute provides that, in assessing a penalty, the ALJ must consider a list of factors,

including "the nature, circumstances, extent, and gravity of the prohibited acts committed and,

---

[8] The Agency rule on admissibility of evidence at hearing, 15 CFR § 904.251, provides
that "all evidence that is relevant, material, reliable, and probative, and not unduly repetitious or
cumulative, is admissible at the hearing."  The testimony of NOAA experts clearly met these
criteria.

with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require.  16 U.S.C. § 1858(a).  It permits a penalty of up to $100,00 for violation of the conservation regulations.  Id.  See also, 15 C.F.R. § 904.108(a) (setting forth same factors).  The statute provides that penalties may be set aside if they are unsupported by substantial evidence.  16 U.S.C. § 1858(b).

The NOAA penalty schedule suggests a penalty well above what the ALJ assessed in this case.  The penalty schedule suggests a monetary range of $60,000 to $100,000 and a permit sanction of up to 100% of the total yearly allocation of fishing days or revocation of the fishing permit altogether.  Vol. V, Tab 117, Agency Ex. 35.  This schedule suggests assessment of penalties well above the penalties that were assessed against Plaintiff.

The Plaintiff contends that the penalty was unwarranted because neither NOAA nor the ALJ properly articulated the basis for the penalties that they would assess and because there was no evidence in the record applicable to assessment of penalty.  These contentions are contrary to the record.  Vol. II, Tab 106 at 19.  First, NOAA discussed the factors to be utilized in assessment on several occasions during the hearing.  Vol. I, Tab 34 at 2-5, Vol. III, Tab 115, TR 16-18; Vol. II, Tab 92 at 23-25, Tab 100, at 11-13.   The ALJ stated in his Decision that NOAA's proposed penalty "serves as a reasonable starting point in determining the amount of the penalty in a particular case."  Vol. II, Tab 106 at 18 (citing In the Matter of: AGA Fishing Corp., 2001 NOAA Lexis 1, at *6 (NOAA App. Mar. 17, 2001); In the Matter of Jody Domingo and Elden Domingo, 2000 NOAA Lexis 1, at 9 (NOAA App. Mar. 29, 2000)).   The ALJ then explicitly addressed the penalty factors leading to his assessment.  Vol II, Tab 106 at 18-22 (citing agency decisions determining that the ALJ is to determine the appropriate penalty de novo).[9]   The ALJ found that the Plaintiff's violation was central to the purpose of the statute's prohibition against

[9] Citing 15 CFR § 904.204(l); also citing In the Matter of Town Dock Fish, Inc., 6 O.R.W. 580 (NOAA App. 1991); In the Matter of: William J. Verna, 4 O.R.W. 64 (NOAA App. 1985)).

15

damaging fixed fishing gear and protecting the lobster industry and thus was a "serious offense." He noted that damage to fixed gear by mobile fishing gear in one year resulted in direct economic loss of nearly $1.8 million, more than $36,000 per lobster vessel. See Vol. V, Tab 117, Agency Ex. 7-8. The regulations close RGA I from October 1 through June 15 each year to all fishing with mobile gear. Vol. II, Tab 106 Vol. V, Tab 117, Agency Ex. 7 at 19, citing Agency Ex. 8, 10. Vol. V, Tab 117. The ALJ determined that the F/V Settler's incursion into RGA I was "neither incidental or accidental." Id. He discredited Plaintiff's defense that the vessel had begun its fishing outside of the RGA I. Id. at 20. He concluded that the F/V Settler's Captain Valente sought to "cover or hide the fact that he was fishing in Restricted Gear Area I" by inputing a waypoint position of 2130 – a position outside of the restricted area – into the Settler's positional chart, conduct that the ALJ found "quite troubling." The ALJ also pointed to a previous fishing finding of liability for a fishing violation by the F/V Settler within the last five years, which included not only an illegal scallop operation but also "interference with a lawful investigation." Id.[10] The ALJ made a finding that NOAA's suggested penalty was insufficient, given the aggravating factors in the case. Id. at 21.[11] It is clear from the record that the ALJ took account of the pertinent factual circumstances of the violation, and that he imposed the penalty in consideration of Plaintiff's degree of culpability, and the gravity of the prohibited act.[12]

When the agency assessed its initial penalty, it could only consider the evidence available at that time. The ALJ, however, had the benefit of all the evidence and testimony offered in the

---

[10]Moreover, Plaintiff had failed to pay the penalty, forcing NOAA to pursue collection efforts. Vol II, Tab 106 at 21.

[11] The ALJ noted that Plaintiff had not raised the defense of Inability to Pay the assessment. Id. He also ruled explicitly that a sanction on the S/V Settler's scallop permit was appropriate because the Settler's Monkfish permit is contingent upon the scallop permit, the Settler is primarily a vessel that fishes for scallops, and the Settler's Days at Sea Permit was revoked, leaving the scallop permit as the most appropriate permit to sanction. Id. at 22.

[12] See Roche v. Daley, 249 F. Supp. 2d 47, 58 (D. Mass. 2003) (same finding).

hearing.  Based on the full expanse of the evidence, the ALJ, as was his prerogative, reached a different decision regarding the gravity of the violation and the Plaintiff's culpability.  Vol. II, Tab 106 at 19.

In the Defendants' view, the increased penalty assessed by the ALJ is more than fair. Not only had Plaintiff knowingly fished in prohibited waters, but Plaintiff created false evidence to cover up its area of fishing.  Not only had Plaintiff been assessed a fishing sanction in the past, but Plaintiff failed to pay the penalty and forced NOAA to pursue collection efforts.  Moreover, in view of what the ALJ determined was a serious violation, the agency guidelines permit much higher penalties, the monetary penalty imposed is below the bottom of the range suggested in the agency's penalty schedule, and the permit sanction revokes only 25% of Plaintiff's total days at sea allocation.  Clearly, the penalty imposed was based on the proper factors and supported by substantial evidence.

**VII.    CONCLUSION**

The findings made by the ALJ are supported by substantial evidence, and the ALJ imposed sanctions against Plaintiff in accordance with law.  Accordingly, this Court is required to deny Plaintiff's Motion for Summary Judgment and affirm the administrative decision.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:     /S/ Anita Johnson_____
        ANITA JOHNSON
        Assistant U.S. Attorney
        U. S. Attorney's Office
        John Joseph Moakley
        United States Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA  02210
        (617)748-3266

17

Of Counsel:

Alexa Cole
Enforcement Attorney
Office of General Counsel
Nat'l Oceanic and Atmospheric Administration
8484 Georgia Ave, Suite 400
Silver Spring, Md. 20910
(301) 427-2202

<u>Certificate of Service</u>

    I hereby certify that I have served the foregoing upon counsel for Plaintiff, Stephen M. Ouellette, 163 Cabot Street, Beverly, MA 01915, by electronic transmission, on this 27th day of May 2005.

                           /S/ Anita Johnson _____