UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRONTIER FISHING CORP. | ) | CIVIL ACTION |
| | ) | NO.04-11171-DPW |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DONALD EVANS, Secretary of the | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| COMMERCE; AND CONRAD C. | ) | |
| LAUTENBACHER JR. UNDER SECRETARY | ) | |
| FOR OCEANS AND | ) | |
| ATMOSPHERE/ADMINISTRATOR AND | ) | |
| DEPUTY UNDER SECRETARY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
TO CONFIRM AGENCY ACTION AND IN REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff and opposes the Agency's motion to affirm its decision and

replies to the Agency's arguments opposing Plaintiff's motion for summary judgment.

Plaintiff has also filed with its opposition to the motion to confirm the Agency decision, its

responses to the Agency's "undisputed facts."

<u>Discussion</u>

The Plaintiff first notes that the Agency misrepresents the nature of its case against

the SETTLER.  Contrary to the Agency's repeated statements to the effect that it "tracked

the Settler in RGA1" or that SETTLER was "sighted" in RGA1, the CGC SPENCER's

radar does not identify contacts other than as a blip on a screen.[1]  The first visual

observation and identification of the SETTLER, other than observation of her lights, was

made at 22:00 as the CGC SPENCER traveling Northeast passed the SETTLER traveling

---

[1] Plaintiff notes that many vessels currently are required to carry position reporting systems, including
scallopers such as the SETTLER, and that vessel's positions can presumably be objectively determined.  New
USCG systems on some vessels also provide target identification, much the same as an airplane's transponder.

South at a relative speed of 17 knots, Diaz , AR v. III p.63 lines 10-11.  This was the first

time the SETTLER was observed fishing, Diaz, id. at 87, at which time the CGC SPENCER

was well outside of RGA1, see plot of CGC SPENCER's navigation Header Log positions

by Peterson and Ouellette AR v. V, Agency Exhibit 41, Ouellette Report at page 12

(Agency Expert's Peterson's Plot of CGC SPENCER course) and page 13 (Ouellette's plot

of CGC SPENCER course), as was the SETTLER, see analysis in Ouellette report, plots of

course also contained in Agency Exhibit 46, AR v. V.  (Exhibit 46 shows the correct

position of CGC SPENCER at certain times prior to 21:58, but fails to show its correct

travel path NNE at 28 degrees true until 22:01, or its starboard turn at 22:01 to 22:02 and its

actual location from 21:58 to 22:08).  The CGC SPENCER's exact position at each moment

of time is provided by the printed output of the navigation system, referred to as the Header

Log.  Evidentially, at no time was the SETTLER actually observed to be in RGA1[2], thereby

making the Agency's assertions entirely reliant upon circumstantial evidence.[3, 4]

---

[2] References in the Agency records indicate that it believed it had done so.  One is the position provided by the SETTLER's captain, which the boarding officer, Chicoine initially thought was inside RGA1, but was subsequently proved not to be.

[3] The ALJ engaged in an interesting colloquy on this point with Mr. Diaz, when he essentially had Diaz agree that the SETTLER must have been further inside RGA1 than CGC SPENCER's crew observed, based on the 21:58 radar contact.  Diaz noted his estimated position of the SETTLER on Respondent's Exhibit 6; see Diaz testimony AR v. IV at p 593 line 12 to 20.  This contact was well outside of the turn of CGC SPENCER, and could not have been to SETTLER's starboard at 22:02 to 22:08.   In effect, the Judge acknowledged that the position that CGC SPENCER passed SETTLER at 22:00 and the course of SETTLER from 22:02 to 22:08 was inconsistent with the SETTLER having been the 21:58 radar contact.  The ALJ then has to conclude that, despite accepting the Header Log, AR v. II, tab 106,  Initial Decision at section H3, page 48, "[t]he exact location of the CGC SPENCER in the Restricted Gear {sic} is unknown."  Initial Decision, page 48 section H

[4] The Agency at page 9 of its brief refers to Dr. Petersen's "opinion" as confirming that the SETTLER was not operating outside of RGA1 on the night of the incident..  We certainly know it was, at least from 22:00 on.  Dr. Peterson was actually asked whether the vessel detected at 21:40 to 22:08 was inside RGA1, and he opined that it was, AR. V. III page 298.  (The contact at 22:08 is clearly outside of RGA1.)  In fact, his testimony was intended to confirm that the various radar contacts from 21:40 to 22:58 were inside RGA1, AR v. III page 291-292.  When asked whether the contacts from 21:40 to 22:08 were actually the SETTLER, he did not give an opinion, but referred to the testimony of the USCG personnel that the contacts were SETTLER, AR v. IV page 454 line 21 to page 455 line 12 and page 457 line. 16.  The Agency overstates Dr. Peterson's opinion, which is also, in part, clearly wrong as to the 22:08 position.

On the evening of October 16, 1997, CGC SPENCER recorded radar contacts on at least seven occasions, AR v. V, Exhibit 14, (eight including the Fifth Plot in RGA1). The CGC SPENCER took the evening's first range and bearing at 21:40, inside RGA1; this was the only radar contact plotted on that evening, and the remaining contacts were not plotted until a much later time, see hand plot, Agency Exhibit 15, AR v. V.  At 22:00, the CGC SPENCER intercepted the SETTLER, see CIC log, Respondent's Exhibit 3 at fourth page, see also AR. V. Exhibit 19 at page 1, passed  the SETTLER, Diaz Testimony AR v. III pages 119 Line 5-13 and p. 70 line 3-6, visually sighted her with her gear out, Diaz report, AR v. V Agency Exhibit 19 at page 2, and then commenced a turn as recorded in the Header Log.  After completing the turn at 22:02, the CGC SPENCER was traveling South along the western border of RGA1, at most 60 yards inside, with RGA1 to her port, See Agency Exhibit, AR v. V 41, supra, Peterson and Ouellette plots of CGC SPENCER Header Log. From the time of the CGC SPENCER's turn, until 22:08, the CGC SPENCER was off SETTLER's port quarter paralleling SETTLER's southerly course, Diaz testimony AR v. IV page 592, line 15-20.  At 22:05, CGC SPENCER identified the SETTLER via radio contact.  Thereafter, at 22:08, the CGC SPENCER took a range and bearing to the SETTLER, when she was visible alongside the CGC SPENCER at a range of 320 yards, AR. v. V Agency Exhibit 14.

Based on the SETTLER's visable location at 22:08 (A5), the Agency and the ALJ infer that the radar targets A1 to A4 inside RGA1 represented of the SETTLER's location on that evening.  This mere inference was prematurely set in stone by the ALJ and the Agency, as, following the judge's statement that a prima facie case had been made, AR. v. III, Transcript at page 131, and v. IV at page 661, the Agency, and the ALJ both concluded

that anything challenging the presumption that the SETTLER was the radar contact from

21:05 to 21:58 (A1 to A4), was "unreliable," see generally Initial Decision and Order and

Agency responses to Plaintiff's statement of Facts 18, 19, etc…  Plaintiff contends that this

is an error of law and was arbitrary and capricious, as it prevents the Respondent from using

any of the Agency's navigation data and sworn testimony of Coast Guard witnesses that

prove it impossible for the SETTLER to have been inside RGA1, essentially precluding

Plaintiff's use of direct evidence to challenge a circumstantial case.  Once undisputed

evidence is presented that directly contradicts an Agency's inference, the inference thereby

becomes unreasonable. Moreover, Plaintiff asserts that an Agency must consider such

damning evidence, and may not, based on its own inference, reject it as unreliable. NLRB v.

Beverly Enterprises, 174 F.3d 13, 10 (1st. Cir., 1999). In other words, an agency "is not free

to prescribe what inferences it will accept and reject, but [it] must draw all those inferences

that the evidence fairly demands." Id.  This seems particularly true where the Agency

submits the very evidence contradicting its inference, and where such evidence is

undisputed.  In this case, there is direct, undisputed evidence that is utterly inconsistent with

the Agency's presumption that the four radar contacts within RGA1 were the SETTLER.

Indeed, this contention so blatantly defies the empirical truths obtained from the evidence

that the Agency's case fails, both factually and as a matter of law. Hence, the inference that

the SETTLER was the radar contacts from 21:05 to 21:58 is no longer reasonable, and the

Agency can no longer rely thereon. Id.

At hearing, the Plaintiff argued that SETTLER could not have traversed the distance

from the 21:58 radar contact (A4), to the radar plot the CGC SPENCER took when it was

alongside the SETTLER at 22:08.[5]  Using a strained explanation, however, Agency expert

Setterstrom apparently opined that the SETTLER could have allowed her tow cables to run

free whereby SETTLER could achieve a speed of just over five knots, which would,

assuming she traveled on a perfectly straight course, theoretically allow her to travel

between the 21:58 and 22:08 radar contacts (A4 and A5), See Setterstrom testimony AR v.

IV page 829, line 4-22. Such a contention is the product of an overzealous imagination, and

offers, at best, the mere possibility of SETTLER's location at A4 based on an assumed

straight course and on implausible speeds.

Moreover, direct evidence precludes the SETTLER from traveling between plot A4

and the locality where it was sighted by the CGC SPENCER's crew at 22:00.  Although the

Agency disputes many of Plaintiff's assertions as to the "undisputed facts," it acknowledges

that the Header Log provides the position of the CGC SPENCER at all times, Agency

response to Plaintiff's undisputed Fact 10.  The Agency's main witness, Commander Diaz,

reports that after completing the turn made between 22:01 or 22:02 the CGC SPENCER was

approximately 350 yards off of SETTLER's port quarter, traveling on a parallel Southerly

course.  Thus, the only uncertainty regarding SETTLER's position is the accuracy of Diaz's

estimate of the 350 yard distance and relative bearing. In any case, however, it would be

impossible to surmise that the SETTLER was, for example, to port of CGC SPENCER, if

Diaz's testimony is to be credited at all.  There is no question, therefore, that SETTLER was

off of CGC SPENCER's starboard bow at 22:02, and, in turn, paralleling CGC SPENCER's

Southerly course.  As such, the SETTLER was necessarily traveling southward, outside of

RGA1, which is a position she could not possibly have traveled to from the radar contact

---

[5] The Agency somewhat disingenuously "disputes" a number of facts based on the nature of the reference to A1-A5, despite the fact that these terms were used throughout the Exhibits and pleadings.

position at 21:58, see analysis in Ouellette report, AR v. v, Agency Exhibit 41. A simple

time distance calculation, however, precludes SETTLER from changing its direct, straight

line, course from A4 at 21:58 to reach her position at A5 22:08, as this deviation from

Setterstrom's claimed course would require a fantastic increase in speed to allow her to

transit a longer distance in the allotted time to reach a starboard relative position to CGC

SPENCER at 22:02.

The ALJ, however, arbitrarily rejected this argument when he stated in effect "[t]he

location of the CGC SPENCER in the Restricted Gear [sic] is unknown," and when he

repeatedly disregarded any averment or evidence as to the relative positions of the two

vessels, Initial Decision and Order, v. III Tab 106 at page 47, H2. and page 49 H8. The ALJ

held that the CGC SPENCER must have been further inside RGA1 (than her Header Log

recorded) for the CGC SPENCER to have come around the SETTLER, thereby effectively

rejecting the validity of the Header Log's objective and undisputed evidence. Moreover, the

ALJ's marginalization of the Header Log actually undermines the Agency's case, which is,

after all, based on the claimed ability to position the location of radar contacts relative to the

CGC SPENCER, and thereby fix positions relative to RGA1.  The ALJ affixed his blinders

to avoid the inescapable fact that the SETTLER was in a known position relative to the

CGC SPENCER at 22:00, and on a known course from 22:02 to 22:08, because this position

and course, established by the Agency's direct and undisputed evidence, is entirely contrary

to inferences upon which the Agency's claim is based.  In short, the ALJ held that an

inference precludes consideration of the Agency's own direct evidence and undisputed facts.

By repeatedly and summarily rejecting all facts and arguments contrary to their initial

presumption that the SETTLER was in RGA1 as unreliable and unsupported, the ALJ and

the Agency essentially confuse a circumstantial inference with an irrebuttable presumption .

Consequentially, the Agency's position and the ALJ's findings are arbitrary, capricious,

contrary to law and not supported by substantial evidence.

The Agency takes it objections to evidence to the ridiculous when it challenges, for

example, closing speeds of vessels, as unreliable based on the affect they challenge the

presumption that the SETTLER moved from A4 to A5.  See Response to Plaintiff's facts

numbers 31 and 35.  Grade school students are required to calculate closing speeds of

objects at known distances that pass within set times, yet the Agency disputes this simple

arithmetic applied to the Agency's own facts, i.e. range or distance between the CGC

SPENCER and the target at 21:58 (A4), and the known time the CGC SPENCER actually

passed SETTLER combined with CGC SPENCER's known speed.  The results are

unquestionably mathematical, and therefore irrefutable, yet the Agency challenges the

calculations not because they are inaccurate or based on assumptions, but because they lead

to a conclusion contrary to its own.  Only to NOAA and the USCG could arithmetic be

deemed "unscientific."

**The "Phantom Vessel" Defense**

The Agency continues to ridicule the so-called "Phantom Vessel" defense, which is

apparently the Plaintiff's argument that the CGC SPENCER's observed radar contacts from

21:40 to 21:58 must have been another vessel.  In point of fact, the Agency's case requires it

affirmatively prove the absence of other vessels in the area, see findings of the ALJ in which

he gave great weight to the absence of other "radar contacts," Initial Decision and Order,

AR v. II, tab 106 page 15 (but was never informed of the CIC's Fifth Plot of a vessel in

RGA1). Otherwise, the Agency would actually have to conduct a scientific inquiry to match

the 21:40 through 21:58 contacts to the SETTLER.  Even in its pleadings recently filed, the

Agency continues to assert that no other vessels were observed or tracked in the vicinity of

the other targets in RGA1 or the SETTLER.  Since the Agency presumes the radar contacts

were the SETTLER, and refused to consider the direct evidence, such as the Header Log

and the known location of the SETTLER between 22:00 and 22:08, it clearly has not

actually attempted to show that SETTLER could have traveled from the radar contact at

21:58 to the known positions at 22:00, and thence to the known position at 22:08.  In point

of fact, the ALJ alters or ignores the facts presented by the header log to make this scenario

work.

Despite the Agency's energetic declarations that there were no other vessels  in the

area on the evening in question, there is a CIC document recording a fifth radar plot within

RGA1 on that night, clearly agreed not to be the SETTLER.  This Fifth Plot is consistent

with the times , locations, courses and speeds of the A1-A4 contacts. While the Agency

challenges the reliability of this plot, it is, after all, challenging its own document.  The

document constitutes an admission of a party, and is entitled to be considered as such.

There is no doubt that the Agency is now aware of evidence that at least on its face appears

to be an additional radar contact, not considered by the Agency.  Notwithstanding the fact

this plot appears to refute the Agency's case, the Agency ignores it based on a technicality.

Indeed, the "Phantom Vessel" is now established by the Agency's record as FACT, which

completely undermines the Agency's claim that there were no other vessels.  The Fifth Plot

itself shows a course and speeds of this vessel from the 21:58 contact (A4), see Ouellette

Affidavit filed with Plaintiff's Motion to Supplement the Record. This fact, combined with

the CGC SPENCER's heading to the Fifth Plot in RGA1, as detailed in Header Log and

plotted in the Report of Gerald A. Ouellette annexed to the Plaintiff's Motion to Supplement

the Record, conclusively establishes that the target plotted at 10:19 in the evening had

traversed from the 21:58 contact (A4).  It also explains the departure of CGC SPENCER

from SETTLER's side and sudden incursion into RGA1 where the boarding team was

launched.

**The Near Collision**

The Agency harps on Mr. Ouellette's opinion regarding the "near collision" between

the SETTLER and the CGC SPENCER.  There is no question that at 21:58 the CGC

SPENCER proceeded at a speed in of about 15 knots directly at a light it visually sighted,

Diaz testimony v. III page 66 lines 12-16, and believed to a contact  on radar at a range of

2600 yards (A4), AR v. V, Agency Exhibit 14.  (Plaintiff notes that the CGC SPENCER

was not heading towards the radar bearing, but was heading towards the lights of a vessel, a

matter discussed, supra.).  Although Commander Diaz states that it is normal practice to

slow down in advance of an intercept, Diaz testimony AR v. III at page 149, lines 20 to page

150 lines 9, the Header Log establishes that CGC SPENCER entered a turn at 15 knots,

turned 149 degrees in less than 60 seconds, and exited the turn at 8.4 knots, Ouellette

Report, AR v. V, Agency Exhibit 41 at pages 4 (8 lines from the bottom) and 12 (fig. 7)..

Simple arithmetic tells us, assuming the object was not moving, that the CGC SPENCER

should *not* have passed or encountered this radar contact (A4) until the CGC SPENCER

covered 2600 yards, which should have taken 5 minutes at its speed of 15 knots. The CGC

SPENCER, however, passed the lighted vessel it was pointing at in two minutes, and the

objective evidence, i.e. the Header Log, and executed a dramatic turn, not a slow one as

claimed by Diaz.  There are only two possible explanations:  either 1) the A4 target was

moving toward the CGC SPENCER at a speed exceeding that of the CGC SPENCER's 15

knots, or 2) the target that the CGC SPENCER passed at 22:00 was not the 21:58 (A4) radar

contact.  Given where the CGC SPENCER passed the SETTLER at 22:00, and turned

around her, the SETTLER could not have been 2600 yards away from the CGC SPENCER

at 21:58, and thus could not have been the radar contact observed at 21:58 (A4).  In short,

only by rejecting the validity of the Header Log and arithmetic as unscientific can the

Agency and the ALJ avoid the inescapable conclusion that the SETTLER could not have

been the contact at 21:58 (A4).  The Agency sticks to its position, and the ALJ's ruling, that

anything that contradicts the presumption that the SETTLER was the contacts detected at

21:40 to 21:58 (A1 to A4) is unreliable or unscientific.  The cards were stacked against

SETTLER before she even began her case.

**The Discrepancy Regarding the Relevance of the Improper Plot of RGA1**

The Agency appears to deny that its personnel mis-plotted the closed area on the

night of the incident, although the hand plot, AR v. V, Agency Exhibit 15, is clearly drawn

improperly. Contrast to AR v. V, Agency Exhibit 16 to Exhibit 15,  see Report of Gerald A.

Ouellette, AR v. V Agency Exhibit 41.  Even officer Diaz noted that the hand plot used on

the night of the incident was missing one of the northern points delineating RGA1, Diaz

testimony, AR v. III, page 57, lines 9-19.  As Officer Chicoine testified, on the evening of

October 16, 1997, the CGC SPENCER crew believed the SETTLER's claimed starting

position of her tow was inside RGA1, and subsequently learned it was not, AR v. III,

Transcript p. 251 line 22 to p. 252, Line 6.  Based on this mis-plot of RGA1, the Agency's

documents indicated that the Captain's 21:30 starting position was an admission he was

inside RGA1, Diaz Report, AR v. V, Agency Exhibit 19.  Even when this discrepancy was

raised to and reviewed by USCG First District legal officer Commander Richard Yazbek

over two and a half years after the alleged incursion, he made an annotation that the 21:30

position provided by Captain Valente was inside RGA1, AR v. V, Agency Exhibit 41,

Ouellette Report at page 12.  In short, the CGC SPENCER, for more than two and a half

years, believed they had directly observed a violation when they had not.  The precise

position, or even the identity of, the radar contacts was initially of little consequence.[6]  Since

discovery that its plot of RGA1 was inaccurate, the Agency has had to develop a

circumstantial case based on the radar contacts A1 to A4  and on the exclusion of all other

vessels as the contacts inside RGA1.  In order for this makeshift case to succeed, it must

ignore direct, contradictory evidence.  Plaintiff contends that a case jury rigged in such a

fashion is arbitrary capricious, and in violation of accepted law.[7]

**The Discrepancy on the CGC SPENCER's Plotted Course in Agency Exhibit 16**

As noted in its initial filings, the Agency presented its case by showing the ALJ a

completely incorrect and misleading path for the CGC SPENCER between 21:58 and 22:08-

without ever showing the ALJ the actual plotted course of the CGC SPENCER from the

Header Log, even though its expert, Peterson, had plotted it, as depicted in Peterson's

drawing at AR V. Exhibit 41, figure 7, contained in the report of Gerald Ouellette.  Instead,

the Agency repeatedly relied on the Exhibit 16 chart showing the CGC SPENCER's

---

[6] The Agency denied Plaintiff's claim that it was undisputed that the handwritten chart was incorrectly drawn, Agency response to Plaintiff's facts 2, 3 & 4.  In point of fact, the Agency improperly challenges the fact not because it is undisputed, which it is, but because of relevance.  The Agency didn't even use the plots done on the night of the alleged violation at hearing.

[7]       Another unfortunate aspect of this mis-plot was raised by Agency's expert Joseph DeAlteris, when he noted that it appears to be that the cutter's crew may not have paid sufficient attention to the navigational equipment of the SETTLER.  Had the boarding team known that the Captain's claimed starting position was outside RGA1, they might have observed and recorded the track lines from the SETTLER's plotter, which would have demonstrated precisely where the vessel was at all times.  See letter of Agency's consultant Joseph D'Alteris, annexed to letter of Pamela Lafreniere, AR v. II, Tab 82, dated April 30, 2002 (Plaintiff notes that the page two of the April 30 letter is missing and is filing the entire letter as Exhibit 1 hereto).

position at the time it took radar plots, which the Agency now admits was not indicative of

the CGC SPENCER's true course, Agency Response to Plaintiff's Fact No. 12.  Exhibit 16

cuts out the location and course of the CGC SPENCER during the critical time from 21:58

to 22:08.  Yet Agency counsel specifically elucidated from its witness on the stand that the

Exhibit 16 chart accurately portrayed the position of the cutter from 2140 to 2208 based on

the DGPS data in the contact log, Diaz testimony, v. III, page 57 lines 20-21, and showed

the course of the CGC SPENCER and the SETTLER, Diaz testimony, AR v. III page 65

line 16 to page 66 line 4.  Averring that the Exhibit 16 chart was consistent with the DGPS

data was apparently done to establish that the CGC SPENCER would have been on a

reciprocal course from its purported target moving between the 21:58 to 22:08 (A4 to A5)

radar contacts.  In point of fact, the CGC SPENCER's course, recorded in its Header Log, at

the time of the vessel's passing was remarkably different, as depicted in the Ouellette and

Peterson drawings showing the CGC SPENCER's true course.  Had the CGC SPENCER's

course been accurately displayed, it would have been apparent that a vessel moving from the

21:58 contact to the SETTLER's location at 22:08 would have been to the CGC

SPENCER's portside, not the starboard side as SETTLER was observed and videotaped.

The Agency's own expert, Peterson, had accurately drawn a diagram detailing the actual

course of the CGC SPENCER, based on her Header Log, yet the Agency chose not to use it.

Interestingly, Peterson's drawing of the location of the CGC SPENCER between 21:57 and

22:08 only appears in the administrative record as part of the report of Plaintiff's expert

Ouellette, AR v. V. Exhibit 41, figure 7.

**Mr. Ouellette's Opinion**

It is difficult to imagine that USCG personnel would lie about the incidents of October 16, 1997, and in point of fact, Plaintiff's expert Ouellette provided a very good explanation of how the mis-plotted area and a few misperceptions could have resulted in a misunderstanding of the evening's events and confusion between a visually sighted target and a radar contact. These issues are basically as follows:

1.  The failure to accurately draw the RGA1 borders,
2.  Failure to recognize that the plotted position of the SETTLER's captain's stated starting position at 21:30 was outside of RGA1.
3.  Failure to detect the discrepancy between the 61 degrees true bearing to the 21:58 radar contact and the course to the visually sighted contact ahead of the 28 degree true heading of the CGC SPENCER.
4.  Failure to recognize the discrepancy between the range to the 21:58 contact and the time the CGC SPENCER passed the SETTLER
5.  Failure to recognize that the point where the SETTLER was encountered at 22:00 videotaped was outside of RGA1.
6.  Failure to note the impossibility of the SETTLER moving from the 21:58 radar contact to inside of the location of the CGC SPENCER's turn at 22:01 to 22:02.
7.  Failure to note that the lights of the vessel being observed did not show changes in aspect of a vessel following the course of the radar plots

The USCG's errors are somewhat understandable in light of their erroneous belief on the night of October 16, 1997 that CGC SPENCER was in RGA1 and that they had directly observed the SETTLER in RGA1. Given the discovery of this error, the Agency's position which relies on inferences that are clearly challenged by undisputed, direct evidence is unsupportable. The Agency cannot properly refuse to consider, and outright reject without consideration, the Respondent's arguments based on the Agency's facts, merely because they conflict with an Agency inference.

**The Fifth Plot inside RGA1**

The Fifth Plot in RGA1 appears to confirm exactly what Respondent contended before this contact was brought to the attention of Respondent's expert, see report of

Ouellette AR v. V, Agency Exhibit 41.  Notably, only during hearing was it revealed that

another radar operator may have been observing the events of October 16, 1997.

Apparently the other CGC SPENCER witnesses were unaware of the recordation of radar

contacts by CIC personnel.  The Coast Guard and NOAA are now acutely aware of the

existence of the Fifth Plot in RGA1, and refuse to acknowledge the significance of their own

documents that they have produced.  NOAA is aware of a number of complaints regarding

mistaken radar plots, in part because of a letter sent by the undersigned counsel to members

of Congress, which has been the subject of discussions between the undersigned and the

NOAA Office of the General Counsel, NOAA and the Coast Guard Law Enforcement

Office of the Unites States Coast Guard, First District, see letter annexed hereto as Exhibit 2.

Once again, a fishing vessel has discovered the "smoking gun" that absolves it from an

alleged violation.

## Conclusion

For the foregoing reasons, this Court should:

1.    Reverse as arbitrary and capricious, unsupported by substantial evidence and
      contrary to law, the Agency's finding of a violation
2.    Order remission of the fine by the Agency
3.    Order that the permit sanction be vacated
4.    Order the Agency to pay Plaintiff's fees and costs in accordance with the
      Equal Access to Justice Act
5.    Grant Plaintiff such further relief as the Court deems just and proper.

**FRONTIER FISHING CORP**
By its attorneys
*/s/ Stephen M. Ouellette*
Stephen M. Ouellette, Esquire
BBO No.:  543752
David S. Smith, Esquire
BBO No.: 634865
CIANCIULLI & OUELLETTE
163 Cabot Street
Beverly, MA 01915
Tel:  (978) 922-9933
Fax:  (978) 922-6142

Dated:  June 27, 2004