UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRONTIER FISHING CORP.,           )
    Plaintiff,                    )
                                  )          CIVIL ACTION NO.
        v.                       )          04-11171-DPW
                                  )
DONALD EVANS, Secretary of        )
the United States Department      )
of Commerce; and CONRAD C.        )
LAUTENBACHER JR., Under           )
Secretary for Oceans and          )
Atmosphere/Administrator and      )
Deputy Under Secretary,           )
    Defendants.                   )


MEMORANDUM AND ORDER
March 31, 2006

    Plaintiff Frontier Fishing Corp. ("Frontier Fishing") brings
this action against the Secretary of the Department of Commerce
and the Under Secretary for Oceans and Atmosphere ("the
Defendants") to appeal penalties imposed by the National Oceanic
and Atmospheric Administration Fisheries Service ("NOAA"), a
division of the Department of Commerce.  Frontier Fishing
challenges NOAA's assessment of a fine and permit sanction for
allegedly fishing in a Restricted Gear Area contrary to
regulations promulgated under the Magnuson-Stevens Fisheries
Conservation and Management Act ("Magnuson-Stevens Act", 18
U.S.C. §§ 1801 et seq.).  On cross motions by the parties, after
denying an effort by Frontier Fishing to supplement the record
before me, I find that the Secretary's Findings and Order, which

-1-

rest upon a factual premise that is not tenable, must be set aside because they cannot be said to be supported by substantial evidence.

## I. BACKGROUND

### A. Factual History

On the evening of October 16, 1997, Manuel Valente, who is not a party to this appeal, served as Captain and Operator aboard the fishing vessel SETTLER ("F/V SETTLER"), which was owned by Frontier Fishing. The fishing vessel departed New Bedford, Massachusetts on a fishing trip targeting monkfish south of Nantucket, Massachusetts. [Administrative Record ("A.R.") II, Tab 106, p. 3 at ¶¶ 3-5; Joint Stipulations of Fact (JSF), A.R. II, Tab 89, ¶¶ 1-2; A.R. IV, Tr. at p. 499.] Captain Valente testified that he intended to fish in the Atlantis Canyon and navigated the F/V SETTLER to a manually-inputted waypoint, identified as Point D on A.R. V, Respondents Ex. 6, using his plotter. [A.R. IV, Tr. at p. 539.] The F/V SETTLER's LORAN navigational system was functioning properly at all relevant times that evening. [A.R. II, Tab 106, p. 3 at ¶ 4; JSF, A.R. II, Tab 89, ¶ 13.] Captain Valente was engaged in fishing, as defined by the Magnuson-Stevens Act, throughout the time period 21:30 to 22:08, [JSF, A.R. II, Tab 89, p. 2 at ¶ 10], but he claimed that the F/V SETTLER put its gear in the water at Point D and continued southerly along the Restricted Gear Area 1 (RGA1)

border. [A.R. IV, Tr. at p. 531.] Captain Valente had plotted the coordinates of RGA1 in the F/V SETTLER's plotter prior to commencing the trip.[A.R. II, Tab 105, p. 4 at ¶ 13.]

That same evening, the United States Coast Guard Cutter SPENCER ("USCGC SPENCER"), conducted a routine patrol of the waters southeast of Nantucket. [A.R. II, Tab 106, p. 3.] The visibility was clear up to eight miles. [A.R. V, Agency Ex. 12; A.R. II, Tr. at p. 35.] During the 20:00 to 24:00 watch aboard the USCGC SPENCER that night, Lieutenant Commander Charley Diaz was the Executive Officer and Underway Officer on Deck, Ensign Craig Toomey was the break-in Officer and Conning Officer, and Quartermaster First Class Matthew Coppola was the Quartermaster of the Watch. [JSF, A.R. II, Tab 89, p. 1.] At approximately 21:05, the USCGC SPENCER was traveling north, northeast when one of the officers notified Commander Diaz of a radar contact off the ship's port bow. [A.R. V, Agency Ex. 19, A.R. III, Tr. at 36.] Shortly thereafter, the lookout reported a white light on the horizon. [A.R. V, Agency Ex. 20, A.R. III, Tr. at 171.] As the USCGC SPENCER drew closer to the light, crew members were able visually to observe green over white lights indicating a vessel trawling at night. [A.R. III, Tr. at 39-42, 171; A.R. V, Agency Ex. 13.]

When the radar target was initially identified, it was assigned the contact number 8174. The evidence in the Administrative Record conflicts as to what instrument made this

initial designation.  At the hearing, Commander Diaz testified
that the number came off the Command Display and Control (COMDAC)
navigation system, but in his Offense Investigation Report he
reported that the ship's Combat Information Center (CIC), which
is located separately from the bridge, commenced a track on this
contact and assigned the tracking number.[1] [Cf. A.R. III, Tr. at
46 and A.R. V, Agency Ex. 19, p. 1.] The ALJ accepted the latter
scenario as a fact. [A.R. II, Tab 106, p. 4 at ¶ 19.]

    Commander Diaz ordered his crew to start plotting the radar
target. For each interval, the Quartermaster would record the
following data on the contact log: the ship's own position at sea
using both its Differential Global Positioning System (DGPS),
which specifies the ship's location in longitude and latitude
values every minute in a header log, and its LORAN navigational
system; the radar range and bearing (the angle relative to true
North) to the contact target;[2] and the course and speed of the
contact target determined by the COMDAC system. [A.R. V, Agency
Ex. 14; A.R. III, Tr. at p. 43-47, 203; Plaintiff's Facts, ¶¶ 8-
10.] The Quartermaster used this data to plot the positions of

---

[1] Agency Exhibit 19 mistakenly identifies the track number
as 8147 instead of 8174. The Agency corrected this error both in
oral testimony at the hearing, see A.R. III, Tr. at 105, and in
the Post-Hearing Brief. [See also Defendants' Response to
Plaintiff's Statement of Undisputed Facts, ¶ 6.]

[2] The Conning Officer Craig Toomey was manning the radar at
the relevant times and reading the measurements to the
Quartermaster. [A.R. III, Tr. at p. 170-71; A.R. V, Agency Ex.
20.]

the USCGC SPENCER and the target at discrete intervals on a chart that the crew was using to navigate from the bridge.[3] [A.R. V, Agency Ex. 15; A.R. III, Tr. at pp. 48-9, 204.] At the same time, other crew members were using binoculars and big eyes (oversized binoculars that allow one to see well at a fairly long distance) to visualize the lights initially observed on the horizon. [A.R. III, Tr. at pp. 39, 42.] As the Quartermaster recorded the information, other crew members correlated the visual on the lights with the location of the radar target by determining the bearing of the lights using an instrument called an alidade. [Id. at p. 42; A.R. II, Tab 106, p. 5 at ¶ 22.]

After the first radar fix of the target numbered 8174 at 21:40 (point A1 on the Exhibits), which the Quartermaster determined to be inside RGA1, the USCGC SPENCER altered its course to intercept the target vessel at a high rate of speed. [A.R. II, Tab 106, p. 5 at ¶ 25.] As the USCGC SPENCER approached, the Quartermaster again plotted the vessel inside RGA1 at 21:47, 21:52, and 21:58 (points A2, A3, and A4 on the Exhibits). [Id. at ¶ 26.] Commander Diaz verified each position visually and on the radar screen. [Id.; A.R. III, Tr. at 67.] The USCGC SPENCER took three other radar fixes of its target at 22:08, 22:19 and 22:24.  The location of the contact at each of

---

[3] One point of the GAS1 boundary was misplotted on the chart, but this had no effect on whether four of the plots of the USCGC SPENCER's radar target were accurately determined to be in the GSA1 area. [A.R. III, Tr. at 56-57.]

these times was outside the RGA1. Frontier Fishing admits that the radar fixes for the last three times were the F/V SETTLER. [A.R. V, Agency Ex. 41, p. 1.]

At approximately 22:00, Commander Diaz observed the target vessel fishing less than 1,000 yards off USCGC SPENCER's starboard side. [A.R. III, Tr. at 70; A.R. V, Agency Ex. 19.] Around 22:01, the USCGC SPENCER activated its law enforcement light and began a turn to come around the target vessel. [A.R. V, Agency Ex. 37; A.R. III, Tr. at 75, 595, 643.] Around 22:05, Commander Diaz used a radio to hail the target vessel. [A.R. V, Agency Ex. 19.] A crew member on the F/V SETTLER identified the vessel in response to the call. [Id.] The USCGC SPENCER began filming the F/V SETTLER around 22:05 and intercepted[4] the fishing vessel at 22:08 just outside RGA1. [A.R. II, Tab 106, p. 6 at ¶ 30.] USCGC SPENCER crew eventually boarded the F/V SETTLER, whose gear was still in the water. [Id., at ¶ 34.] The Boarding Officer, Gunner's Mate First Class Richard Chicoine interviewed Captain Valente and his crew and looked at the F/V SETTLER's plotter. [Id. at ¶¶ 35-36.] He issued Frontier Fishing and Captain Valente citations for fishing with mobile gear in RGA1 contrary to the regulations adopted pursuant to the Magnuson-Stevens Act.

---

[4] The Combat Information Center (CIC) logs indicate that the USCGC SPENCER "intercepted" the F/V SETTLER at 22:00. [A.R. V, Respondents Ex. 3, p. 4.]

**B. Procedural History**

On October 16, 1997, the USCGC SPENCER issued F/V SETTLER and its Captain a joint and several written citation for fishing with mobile gear (trawl nets) in the RGA1 defined in 50 C.F.R. § 648.81(j)(1) between October 1 and June 15 contrary to 50 C.F.R. § 648.14(a)(98). On February 28, 2000, NOAA issued a Notice of Violation and Assessment (NOVA) and Notice of Permit Sanction (NOPS) assessing a joint and several civil fine of $10,000, a 60-day permit sanction imposed on Captain Valente's Commercial Operator Permit, and a 30-day permit sanction imposed on Frontier Fishing's Northeast Multispecies Days-at-Sea Permit. [A.R. I, Tab 1.] NOAA's motion to amend the NOVA/NOPS so that the 30-day permit sanction would be imposed on Frontier Fishing's Northeast Scallop Days-at-Sea Permit instead of its Multispecies Permit, which had been revoked for reasons unrelated to this case, was granted on March 20, 2001 over Frontier Fishing's objections. [A.R. I, Tabs 17, 24.]

A hearing on the alleged violation was held on August 14 and 15, 2001 and November 19 and 20, 2002 before United States Coast Guard Administrative Law Judge Parlen McKenna (the "ALJ"). [A.R. II, Tab 106, p. 1.] On August 5, 2003, the ALJ affirmed NOAA's finding of a violation concluding that:

> The Agency has established by a preponderance of reliable and credible evidence that Respondents Valente and Frontier violated the Magnuson-Stevens Act and its underlying regulation codified at 50 C.F.R. §

648.14(a)(98) by unlawfully fishing in Restricted Gear Area I with trawl gear between the hours of 2140 through 2158 on the evening of October 16, 1997 when the area was closed to mobile gear. [A.R. II, Tab 106, p. 8 at ¶ 10.]

The ALJ ordered 30-day permit suspensions for both Captain Valente and Frontier Fishing and increased the joint and several civil fine to $35,000. [Id., p. 22.]

Frontier Fishing brought a petition for discretionary review pursuant to 15 C.F.R. § 904.273, which was denied on May 3, 2004. [A.R. II, Tab 111 and Tab 114.] On June 2, 2004, Frontier Fishing filed this action against the Secretary of the Department of Commerce and the Under Secretary for Oceans and Atmosphere seeking review pursuant to 16 U.S.C. § 1858(b). NOAA has filed and served a five-volume Administrative Record.

In the proceedings below, the Respondents, Frontier Fishing and Captain Valente, agreed that the radar aboard the USCGC SPENCER reliably measured something in the RGA1 at 21:40, 21:47, 21:52 and 21:58. [A.R. II, Tab 106, p. 9.] However, they argued, and Frontier Fishing continues to maintain in this action, that the contact in RGA1 could not have been the F/V SETTLER for a number of reasons discussed below. Frontier Fishing also continues to argue that the alternate straight trawl path outside the RGA1 described by Captain Valente accounts for all of the USCGC SPENCER's visual observations, assuming the crew was focused on the visual of the F/V SETTLER and not the radar contact's location during its approach to the RGA1 border. [A.R.

IV, Tr. at 535-39, 674.]

To explain the discrepancy between the USCGC SPENCER's visual observations and its radar data, Frontier Fishing hypothesizes that another vessel or a high flyer[5] was responsible for the radar contacts in the RGA1. According to Frontier Fishing's expert, Professor Gerald Ouellette, this other vessel or high flyer might have acted as a "brilliant search light" to USCGC SPENCER's radar creating enough "clutter" that the F/V Settler could not be detected by the radar until the ships got much closer. [ A.R. IV, Tr. at 652-53.] Consequently, it was only when the USCGC SPENCER got very close to the F/V SETTLER at 22:08 that its radar could detect the fishing vessel and not the other vessel or high flyer.

The ALJ accepted that since RGA1 was open to fixed fishing gear on October 16, 1997, there were a number of high flyers in the vicinity. [A.R. II, Tab 106, p. 4 at ¶ 16; see also A.R. IV, Tr. at 500-501.] However, the ALJ rejected Professor Ouellette's

---

[5] A high flyer is defined in the Fishery Conservation and Management regulations as a "flag, radar reflector or radio beacon transmitter, suitable for attachment to a longline to facilitate its location and retrieval." 50 C.F.R. § 635.2. The ALJ defined high flyers as "radar reflectors tied to two buoys used to assist lobster vessels in locating lobster pots. [A.R. II, Tab 106, p. 4 at ¶ 15.]

Frontier Fishing's expert Professor Gerald Ouellette testified that "lobster boats usually have one high flyer way up on the mast because they know that no one can see them... Some of them carry as many as ten or twelve high flyers so you can have a row of ten or twelve high flyers on a lobstering boat[.]" [A.R. IV, Tr. at 653.]

theory concluding that "[t]here is no reliable and credible evidence that brilliance from the high flyers produced radar 'clutter,' which obstructed the Coast Guard's view and prevented the Coast Guard from seeing any other vessels in the area on the radar screen." [A.R. II, Tab 106, p. 4 at ¶ 17; A.R. IV, Tr. at pp. 652-53.]   Furthermore, the ALJ found that the USCGC SPENCER crew did not observe any other radar contacts or vessels in the area, [A.R., Tab 106, p. 5; A.R. III, Tr. at pp. 42, 68, 173-175, 184, 205; A.R. IV, Tr. at pp. 585, 654-75, 761, 863-64], and that "[b]ased on their knowledge, level of training, and experience, Ensign Toomey and Commander Diaz could distinguish between a high flyer and fishing vessel by observing the image on the radar screen."  [A.R. II, Tab 106, p. 4 at ¶ 18.]

## II. ANALYSIS

### A. Standard of Review of Administrative Proceedings

While Frontier Fishing's motion is styled as a summary judgment motion,[6] the familiar summary judgment standard does not

---

[6] On April 7, 2005 Frontier Fishing filed a Motion and Memorandum for Summary Judgment ("Frontier Fishing SJ Motion" and Frontier Fishing SJ Memorandum").  On May 27, 2005 the Defendants filed a Motion to Affirm NOAA's Decision ("Defendants Motion to Affirm") and a supporting Memorandum ("Defendants Memorandum"), which Frontier Fishing opposes.  On June 27, 2005, Frontier Fishing filed Plaintiff's Opposition to Defendants' Motion to Confirm Agency Action and Responses to Agency's Statement of Facts ("Frontier Fishing's Opposition") and Plaintiff's Memorandum in Opposition to Defendants' Motion to Confirm Agency Action and in Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Frontier Fishing's Opposition/Reply

apply because the underlying action is in fact an appeal brought under the substantial evidence standard of the federal Administrative Procedure Act ("APA"). <u>See</u> 16 U.S.C. § 1858(b). Thus, the question is not whether there is a genuine issue of material fact, but rather whether NOAA's decision is supported by substantial evidence.

The role of the court in reviewing formal administrative adjudication is limited. I may only set aside the Agency's decision to assess a civil fine and a permit sanction under the authority of 16 U.S.C. § 1857 for the F/V SETTLER's alleged 1997 violation of 50 C.F.R. § 648.81(j)(1) if the Agency's findings and order are not supported by substantial evidence. 16 U.S.C. § 1858(b); 5 U.S.C. 706(2)(E).[7] But, in making this determination, I am not simply a rubber stamp for the agency action. <u>Penobscot Air Services, Ltd. v. Federal Aviation Administration</u>, 164 F.3d 713, 718 n. 2 (1st Cir. 1999). Rather, I must review the whole record or those parts of it cited by the parties. 5 U.S.C. §

---

Memorandum").

[7] Frontier Fishing mistakenly asserts that I must set aside agency action and the ALJ's conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," but 16 U.S.C. § 1858(b) specifically directs that I apply the substantial evidence standard in reviewing the Agency's findings and order. This standard of review is "more stringent than the traditional 'arbitrary and capricious' standard for informal rulemaking." <u>Industrial Union Department v. American Petroleum Institute</u>, 448 U.S. 607, 705 (1980).

706(2).

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Penobscot, 164 F.3d at 718 quoting Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477 (1951). The Supreme Court has "equated the substantial evidence standard with 'whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion.'" Penobscot, 164 F.3d at 718 quoting Allentown Mack Sales & Services, Inc. v. National Labor Relations Board, 522 U.S. 359, 366-67 (1998). This standard "'gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable factfinder.'" Penobscot, 164 F.3d at 718 quoting Allentown, 522 U.S. at 377 (emphasis in original). More recently, the First Circuit has stated:

> While substantial evidence is more than a scintilla, it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases. Rather, we will accept the findings and inferences drawn by the ALJ, whatever they may be, unless they are irrational. We have also recognized that it is the ALJ's unique prerogative in the first instance to draw inferences and make credibility assessments, and we may not disturb his judgment and the Board's endorsement of it so long as the findings are adequately anchored in the record.

Bath Iron Works Corp. v. U.S. Department of Labor, 336 F.3d 51, 56

(1st Cir. 2003) (internal citations and quotations omitted).

In evaluating an administrative record, the reviewing court must take into account contradictory evidence, but "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Penobscot, 164 F.3d at 718 quoting American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 523 (1981). Nonetheless, the agency's findings 'must be set aside when the record ... clearly precludes the agency's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.'" Penobscot, 164 F.3d at 718 quoting Universal Camera, 340 U.S. at 490 (alterations omitted). "Although an agency's answers to questions of law require somewhat greater scrutiny, the court owes 'substantial deference to an agency's interpretation of its own regulations.'" Northern Wind, Inc. v. Daley, 200 F.3d 13, 17 (1st Cir. 1999) quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

**B. Supplementation or Restriction of the Record Before this Court**

At the outset, and before I take up the merits, I address Frontier Fishing's motion to supplement the administrative record before me with a one-page document alleged to be from USCG SPENCER's Combat Information Center (CIC) logbook and the

-13-

Defendants' Motion to strike Plaintiff's new exhibits.  As an alternative to supplementation, Frontier Fishing requests (1) permission to conduct further discovery to determine whether there are CIC radar logs that were not produced and regarding the Agency's understanding of such logs in question or (2) that the matter be remanded with an order for the Agency to review the document and any other CIC materials and reconsider its decision in light of the document.[8]  In addition, I address Frontier Fishing's request to have certain testimony offered against them at the administrative hearing excluded.

## 1. Supplementation and Further Development

The additional document Frontier Fishing seeks to present, attached as Exhibit A to Plaintiff's Motion to Supplement, is page 9 of a set of materials (CIC logs and radar manual) produced by the Agency to Frontier Fishing by fax prior to the start of the administrative trial on August 10, 2001. [Plaintiff's Motion to Supplement the Administrative Record or to Conduct Discovery ("Plaintiff's Motion to Supplement"), pp. 2-3.] The rest of the materials produced were entered as an Exhibit called "CIC Logs". [A.R. V, Respondents Ex. 3.]  The additional page consists of a

---

[8] For reasons developed in Section II.C., _infra_, I will order a remand on grounds related to the merits.  I do so without prejudice to such further development of the record as appears advisable to the ALJ.  For present purposes, I address the question of further development of the record lodged at this time in this Court.

single line of handwritten entries on a form that resembles a
radar tracking log form of the type used by U.S. Coast Guard
vessels. [Defendants' Opposition to Supplementation of the
Administrative Record, p. 1.].  The chart bears the date October
16, 1997, the time 10:19, the track number 8174, the remarks
"SETTLER Pts", and navigational data, but it does not identify an
author or the vessel on which the author was stationed.[9]  For
this document to be at all relevant, the time 10:19 must be taken
to be 10:19 pm (22:19), as suggested by Frontier Fishing, even
though the U.S. Coast Guard practice is to use military time.
[Defendants' Opposition to Supplementation of the Administrative
Record ("Defendants' Opposition to Supplementation"), p. 2 n. 1.]
I make no finding on the meaning of this document because, in
accordance with the reasoning below, I decline to allow Frontier
Fishing to supplement the administrative record now before me
with it.

Frontier Fishing acknowledges that my review must be focused
on the administrative record, see Plaintiff's Motion to
Supplement, p. 6 at ¶ 19 citing Florida Power & Light Co. v.
Lorion, 470 U.S. 729, 743 (1985), Camp v. Pitts, 411 U.S. 138,

---

[9] The Defendants further observe that contrary to standard
Coast Guard protocol, the log is unsigned and does not contain
the standard line drawn over the unused portion of the page (done
to ensure that no later additions are made to the document).
[Defendants' Opposition to Supplementation of the Administrative
Record ("Defendants' Opposition to Supplementation"), p. 2.]

142 (1973), and <u>Valley Citizens for a Safe Environment v.</u>
<u>Aldridge</u>, 886 F.2d 458, 460 (1st Cir. 1989), "not some new record
made initially in the reviewing court." <u>Camp v. Pitts</u>, 411 U.S.
at 142. <u>See</u> <u>also</u> <u>Olsen v. U.S</u>, 414 F.3d 144, 155 (1st Cir. 2005).
"If a court is to review an agency's action fairly, it should
have before it neither more nor less information than did the
agency when it made its decision." <u>Walter O. Boswell Memorial</u>
<u>Hospital v. Heckler</u>, 749 F.2d 788, 792 (D.C. Cir. 1993). "To
review more than the information before the Secretary at the time
[of the] ... decision risks our requiring administrators to be
prescient or allowing them to take advantage of post hoc
rationalizations." <u>Id.</u> Nonetheless, Frontier Fishing urges that
I consider the document because the Agency failed to consider
this potentially exculpatory evidence.

To be sure, two limited exceptions to the rule against
record supplementation exist: (1) when there is a "strong showing
of bad faith or improper behavior," <u>Citizens to Preserve Overton</u>
<u>Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971) and <u>Town of Norfolk</u>
<u>v. U.S. Army Corps of Engineers</u>, 968 F.2d 1438, 1458-59 (1992),
and (2) when there was such a "failure to explain administrative
action as to frustrate effective judicial review." <u>Camp v.</u>
<u>Pitts</u>, 411 U.S. at 142-143. In any event, "the proper course,
except in rare circumstances, is to remand to the agency for
additional investigation or explanation." <u>Florida Power & Light</u>,

470 U.S. at 744.  See Olsen, 414 F.3d at 155.  Frontier Fishing

also cites to a list of eight scenarios where courts have allowed

extra-record evidence. [Plaintiff's Motion to Supplement, p. 7 n.

1 citing ITT Federal Services Corp. v. U.S., 45 Fed. Cl. 174, 185

(Fed. Cl. 1999) and Welch v. U.S. Air Force, 249 F.Supp.2d 797,

810 (N.D.Tex. 2003)).]  The First Circuit has not adopted this

list and the cases cited apply these scenarios in the context of

judicial review of informal agency actions, as opposed to the

review of a defined record created by a formal administrative

adjudication.[10]

---

[10] ITT Federal Services Corp. cites to Esch v. Yeutter, 876
F.2d 976, 991 (D.C. Cir. 1989), which in turn cites to Steven
Stark & Sarah Wald, Setting No Records: The Failed Attempts to
Limit the Record in Review of Administrative Action, 36 Admin. L.
Rev. 333, 344 (1984) at n. 166.  The authors specifically noted
the distinction between the judicial review of a defined record
created by a formal adjudication and judicial review of informal
agency actions.  Id. at 1-2 n. 4. The authors further noted that
their article deals "almost exclusively with the record in
informal agency actions, since questions concerning the record in
formal proceedings are by nature far less frequent or
troublesome."  Id.
     The cases to which the Plaintiff cites in support of
supplementation all involve judicial review of informal, non-
adjudicatory decisions.  See Sierra Club v. Marsh, 976, F.2d 763,
772-73 (1st Cir. 1992), Hough v. Marsh, 557 F.Supp. 74, 84, n. 12
(D.Mass. 1982), County of Suffolk v. Secretary of Interior, 562
F.2d 1368, 1384 (2d Cir. 1977), cert. denied, 434 U.S. 1064
(1978), and Aldridge, 886 F.2d at 460.  Some of these are
National Environmental Policy Act (NEPA) cases, which some courts
consider as falling within the "rare circumstances" that justify
a court's departure from the record rule.  See e.g. County of
Suffolk, 562 F.2d 1368, 1384 (2d Cir. 1977), where the Second
Circuit explained that in NEPA cases, "a primary function of the
court is to ensure that the information available to the
decision-maker includes an adequate discussion of environmental
effects and alternatives, which can sometimes be determined only
be looking outside the administrative record to see what the

Here, there is simply no evidence of bad faith on the part of NOAA and the voluminous Administrative Record consisting of correspondence between the parties, NOAA's initial and final order, and the proceedings before the ALJ, which includes the ALJ's comprehensive 57-page decision, the briefs, the transcript, and exhibits, is more than sufficient to allow effective judicial review.  Simply raising the question of whether NOAA improperly ignored some evidence in the possession of both parties prior to the start of a formal administrative adjudication, but not admitted as evidence in the ALJ hearing, is not a ground for supplementing the record.  Accordingly, I will deny Frontier Fishing's motion to supplement the Administrative Record.  Since Frontier Fishing has not provided any reason, let alone a permissible reason, to supplement the record with the letter from Joseph T. DeAllen's and the "continuous radar plot," attached as exhibits to Frontier Fishing's Opposition to the Defendants' motion to affirm (See Docket #24-1, 25-1), I will also grant the Defendants' motion to strike these exhibits.

As an alternative to supplementing the record with the so-called missing CIC logbook page, Frontier Fishing requests permission to conduct further discovery to determine whether there are CIC radar logs that were not produced and the Agency's

agency may have ignored." (internal citations omitted).  This exception obviously does not apply here.

understanding of the particular document in question.  I will
deny this request also.

In April 2000, the Agency filed a Preliminary Position on
Issues and Procedures (PPIP), which included a detailed list of
all of the Agency's potential exhibits.  Copies of these
exhibits, which included "all radar data" as part of the Offense
Investigation Report, were provided to Frontier Fishing. [A.R. I,
Tab 8, p. 2.]  After receiving this information, Frontier Fishing
made numerous formal discovery requests to obtain additional
information during the administrative process.[11]  In addition,
according to the Defendants, Frontier Fishing made a number of
less formal discovery requests directly to the Agency, including
one on August 2, 2001 that resulted in the Agency's production of
the document in question on August 10, 2001. [See Plaintiff's
Motion to Supplement, Ex. D, p. 2; Defendants' Opposition to
Supplementation, p. 7, n. 7.]

As a general rule, discovery is not allowed in an action for
judicial review upon an administrative record for the same
reasons that supplementation is generally not permitted.  Olsen,

---

[11] See A.R. I, Tab 7 (Request for Production of Documents),
Tab 26-27 (Motion for Leave to File Interrogatories), Tab 32
(Amended Motion for Discovery), Tab 35 (Motion for Production of
Documents), and Tab 57 (Respondents' Motion for Discovery of
Expert Witness Information).  Some of these requests were
opposed. [A.R. I, Tab, 8 (Opposition to Request for Production of
Document) and Tab 30 (Opposition to Motion for Leave to File
Interrogatories).]

414 F.3d at 155-56.  "[A]t least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator.... It is almost inherent in the idea of reviewing agency or other administrative action for reasonableness; how could an administrator act unreasonably by ignoring information never presented to it?" Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003)(footnote omitted).  Here, I find there is no good reason to allow discovery.  Frontier Fishing was given ample opportunity to conduct discovery in the administrative proceedings and has moved for summary judgment even without the information it would seek on discovery.  The Defendants have provided all of the information they relied on in making their determination and the ALJ determined that information was sufficient.  Furthermore, there is nothing before me suggesting that the Agency did not understand its duty to produce any potentially exculpatory evidence. [See e.g. A.R. I, Tab 61, p. 1 citing Brady v. Maryland, 373 U.S. 83 (1963)]  Accordingly, I deny Frontier Fishing's motion for further discovery.  Rather than remand on this issue, I will construe the Administrative Record as has been created to date.

2. Exclusion of Testimony - Frontier Fishing argues that it was a clear error of law for the ALJ to shirk his gate-keeping responsibility by not excluding the testimony of Carl Setterstrom

-20-

and Marine Officer Neelon.  I disagree.  NOAA adequately
established the reliability of both witnesses, [A.R. IV, Tr. at
pp. 798-99, 835-37], and the ALJ noted the limitations raised by
the Respondents with respect to Neelon. [Id. at pp. 798, 843.]
Furthermore, the ALJ applied the correct law in his decision.
[A.R. II, Tab 106, pp. 9-10 citing United States Steel Mining Co.
v. Director, Office of Worker's Compensation Programs, Dep't of
Labor, 187 F.3d 384, 388-89 (4th Cir. 1999) and Consolidation
Coal Co. v. Director, Office of Worker's Compensation Programs,
Dep't of Labor, 294 F.3d 885, 893-94 (7th Cir. 2002)].  There is
no basis for exclusion of this testimony.

## C. Substantial Evidence

        In his decision, the ALJ correctly stated that the burden of
proof is on NOAA to prove the alleged violation by a
preponderance of the evidence. [A.R. II, Tab 106, p. 8 citing 5
U.S.C. § 556(d) and In the Matter of: Binks Seafood Co., Inc.,
No. NE010121, 2003 NOAA Lexis 6, *15 (March 17, 2003).]  See also
Steadman v. S.E.C., 450 U.S. 91 (1981)(finding that the term
'supported by and in accordance with the reliable, probative, and
substantial evidence' should be construed as establishing the
standard of proof of preponderance of evidence).] A preponderance
of the evidence means that NOAA must show it is more likely than
not the Respondents committed the violation with which he is
charged. [A.R. II, Tab 106, p. 8 citing Binks Seafood Co., 2003

NOAA Lexis at *15.] Once the ALJ finds that NOAA has established a prima facie case, the burden of production shifts to the Respondents to rebut or discredit NOAA's evidence. [A.R. II, Tab 106, p. 8.][12]

Here, the ALJ's conclusion that NOAA satisfied its burden of proof may be broken down into the following factual determinations:

> (1) the USCGC SPENCER reliably measured something in RGA1 at four discrete times [Dr. Benjamin B. Peterson ("Peterson Report"), A.R. V, Agency Ex. 32];
>
> (2) no other radar targets were detected in RGA1 by the COMDAC system between 21:30 and 22:08 and only one lighted vessel was observed in the area [Commander Diaz' testimony at A.R. III, Tr. at p. 42, A.R. IV, at Tr. p. 654; Ensign Craig Toomey's testimony at A.R. III, Tr. at pp. 173-74, 183-84];
>
> (3) it was unlikely that the USCGC SPENCER crew would have failed to observe another radar target or lighted vessel [Commander Diaz' testimony at A.R. IV, Tr. at pp. 651, 655-56, 658-59; Ensign Craig Toomey's testimony at A.R. III, Tr. at p. 175; Quartermaster's testimony at A.R. III, Tr. at pp. 205-06];
>
> (4) the lighted vessel being observed by the USCGC

---

[12] Although the ALJ set out the burden shift in this manner in the written decision, I note that he incorrectly stated during the hearing that the burden shifted to the Respondents to demonstrate, by a preponderance of evidence, that the vessel in RGA1 was not the F/V SETTLER or that the F/V SETTLER was somewhere else. [A.R. II, Tab 106, p. 661-64] NOAA retains the ultimate burden of persuasion even after it has established a prima facie case and only the burden of production of evidence to the contrary shifts to the Respondents. See Office of Worker's Compensation Programs, Dep't of Labor v. Greenwich Colliers, 512 U.S. 267, 270-76 (1994) (finding the term 'burden of proof' as used in the section of the APA that states "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof", 5 U.S.C. § 556(d), means burden of persuasion, not merely burden of production).

SPENCER crew as they approached RGA1 was the F/V
SETTLER [Professor Ouellette's testimony at A.R. IV,
Tr. at p. 650; and Ouellette's Report at A.R. V, Agency
Ex. 41, p. 2-3];

(5) the USCGC SPENCER crew correlated their visual
fixes of the F/V SETTLER with the radar fixes
[Commander Diaz's Offense Investigation Report at A.R.
V, Agency Ex. 19; Commander Diaz' testimony at A.R.
III, Tr. at pp. 42-44; Ensign Craig Toomey's testimony
at A.R. III, Tr. at p. 172];

(6) the F/V SETTLER was trawling in the general area
during the relevant times [JSF, A.R. II, Tab 89, ¶ 10;
Captain Valente's testimony at A.R. IV, Tr. at p. 539];
and

(7) the radar targets and visual observations at 22:08,
22:19, and 22:24 were the F/V SETTLER [Captain Valente's
testimony at A.R. IV, Tr. at pp. 502, 533-34, 590; Professor
Ouellette's testimony at A.R. IV, Tr. at pp. 605, 608, 657;
Ouellette's Report at A.R. V, Agency Ex. 41, p. 1].

As set out above in Section II.A., "[t]he  substantiality of

evidence must take into account whatever in the record fairly

detracts from its weight." Universal Camera, 340 U.S. at 488.

Of the above factual assertions Frontier Fishing only contests

whether the USCGC SPENCER crew properly correlated their visual

fixes on the F/V SETTLER with the radar fixes.[13]   The evidence

challenging the correlation is Professor Ouellette's testimony.

Professor Ouellette testified that "the heading and

maneuvering of the CGC Spencer was always directed at the trawler

lights and at no time was the CGC Spencer's maneuvering or

---

[13] Although Frontier Fishing does not raise the argument
explicitly in this appeal, its position appears in effect to be
that the USCGC SPENCER crew must have improperly correlated their
visuals with the radar targets since the F/V SETTLER was never at
the radar target's locations in the RGA1 according to their
theory.  [See Frontier Fishing SJ Memorandum at 4.]

heading directed toward any of the radar points purported to be the F/V SETTLER." [Ouellette's Report at A.R. V, Agency Ex. 41, p. 2-3; See also Professor Ouellette's testimony at A.R. IV, Tr. 647-50.] In reaching that conclusion, Professor Ouellette calculated that the radar target was approximately 11° off USCGC SPENCER's bow at 21:47, 5° off at 21:52 and 33° off at 21:58 while USCGC SPENCER proceeded on its heading of north, northeast 28° directly towards the alleged actual location of the F/V SETTLER until 22:01.[14] [Id. at p. 3.] As additional support, Frontier Fishing continues to assert that if the USCGC SPENCER crew was actually visualizing a lighted vessel at the radar target's locations in the RGA1, then the crew would have seen red lights indicating the port side of the vessel when the radar target moved from location A2 to A3. [Frontier Fishing SJ Memorandum, p. 8; see also Professor Ouellette's Report, A.R. V, Agency Ex. 41, p. 3.]

Neither of these arguments is convincing. There is nothing in the evidence establishing that the angles cited by Professor Ouellette would be unreasonable for a ship attempting to intercept another vessel at a high rate of speed. The contention that the USCGC SPENCER was heading directly at the F/V SETTLER's

---

[14] Professor Ouellette calculated the bearing from USCGC SPENCER's radar and header log. [A.R. V, Agency Ex. 41, p. 2.] NOAA's expert Dr. Benjamin A. Peterson reported that the uncertainty in the bearing values was approximately 1.6°. [A.R. V, Agency Ex. 32, 40.]

hypothetical straight trawl path is inconclusive because of
Professor Ouellette's reliance on the F/V SETTLER's manually-
inputted waypoint.  As for the red port light argument, I concur
with the ALJ that the fact that the USCGC SPENCER crew never
reported seeing the red port side lights between 21:47 and 21:52,
[see A.R. IV, Tr. at 907-14], does not vitiate NOAA's entire
case.  [A.R. V, Tab 106, p. 15.] As Frontier Fishing points out,
the actual visual observations of the vessel were periodic, even
though the vessel was in continuous visual range. [Frontier
Fishing's Opposition at p. 2-3, ¶ 7 citing A.R. IV, Tr. at p.
906.]  Considering these limitations and the testimony of the
USCGC SPENCER crew regarding their practice of correlating their
visuals with the radar target bearing, I find that the ALJ's
conclusion that NOAA correlated the visual and radar readings to
be supported by substantial evidence.

   Acknowledging that NOAA presented sufficient evidence in the
administrative proceedings to establish a prima facie case, the
Respondents presented rebuttal evidence.  During the hearing,
Professor Ouellette conceded that the Respondents could not prove
what object was being detected by USCGC SPENCER's radar in RGA1
at 21:40, 21:47, 21:52 and 21:58 if it was not the F/V SETTLER.[15]

_____

[15] To be clear, the Respondents claimed that just because
the USCGC SPENCER crew failed to observe another radar target or
lighted vessel in RGA1, does not mean there were no other vessels
or high flyers in the area responsible for the radar contacts.
[A.R. IV, Tr. at 651.]  However, there was no evidence supporting

Instead, they attempted to present evidence that established that the F/V SETTLER could not have been the object in the RGA1.  In this appeal, Frontier Fishing renews this strategy arguing two impossibility theories:

> (1) The vessel speed and track indicated by the radar positions of 21:40, 21:47, 21:52 and 21:58 do not fit the common practice of a bottom trawler in tow and could not have been carried out by the F/V SETTLER if she was trawling; and

> (2) It would have been impossible for the F/V SETTLER to move from the radar target's position at 21:58 (A4) to where it was observed by Commander Diaz at approximately 22:00.[16]

I must consider these theories because I am charged with canvassing the whole record, including contradictory evidence or evidence from which conflicting inferences could be drawn.  I note, however, that my review is not "intended to negative the function of ... those agencies presumably equipped or informed by

---

the existence of other vessels in RGA1, apart from the improbability inference discussed below, and while the ALJ accepted that there were high flyers in RGA1, Captain Valente and Commander Diaz agreed that a trained radar operator can tell the difference between a high flyer and another vessel. [A.R. IV, Tr. at pp. 585-86.] Furthermore, Professor Ouellette admitted that there was no evidence supporting his "clutter" theory for why the USCGC SPENCER's radar failed to detect the F/V SETTLER before 22:08 if in fact it was detecting another vessel or high flyer in RGA1 prior to 22:08.  [A.R. II, Tab 106, p. 4 at ¶ 17; A.R. IV, Tr. at pp. 652-53.]

[16] Frontier Fishing also argued before the ALJ that the USCGC SPENCER's record keeping was inconsistent and contradictory, tending to make all of the information recorded suspect.  The ALJ rejected this argument and Frontier Fishing has not renewed the argument at this stage.

experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.  Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera, 340 U.S. at 488.  Rather, the requirement that I consider contradictory evidence means "that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."  Id.

With respect to the first impossibility theory, Frontier Fishing submitted expert reports and testimony by Clifford A. Goudey and Dr. David L. Kan. [A.R. V, Respondents Exs. 5, 12.] Both experts suggested that the radar-determined positions in RGA1 revealed a pattern of speed and course changes that is inconsistent with the normal operation of a fishing trawler engaged in fishing since monkfishing is characterized by long straight tows at towing speeds around 3.0 knots. [Clifford A. Goudey Report ("Goudey Report"), A.R. V, Respondents Ex. 5, p. 1; Dr. David L. Kan ("Kan Report"), A.R. V., Respondents Ex. 12, p.

1; Dr. Kan's testimony, A.R. IV, Tr. at pp. 714-725, 731.] They both also suggested that the rapid changes in course and speed indicated maneuvers not possible by the F/V SETTLER without damage to her nets, assuming she was engaged in trawling. [Id.] The ALJ found that this testimony was contrary to the weight of the evidence because the radar fixes do not represent the actual course of the target (i.e. the turns may not have been as sharp as the path created by connecting the dots suggests, especially given the statistical error, see A.R. V, Agency Ex. 32, Figure 2) and it would not be uncommon or inconceivable for a fishing trawler to navigate a course consistent with the curvature of the canyon. [A.R. II, Tab 106, p. 14.] I note that Carl Setterstrom's report, [see A.R. V, Agency Ex. 44], and Dr. Kan's admissions, [see A.R. IV, Tr. at pp. 734-35, 736-37], also support the ALJ's conclusion that the Respondents "failed to show that the F/V SETTLER could not make the turns evidence[d] in the Coast Guard's plot." [A.R. II, Tab 106, p. 14.] Thus, even considering this evidence, I find that the ALJ's conclusion that the radar targets in RGA1 were the F/V SETTLER was reasonable.

The second impossibility theory embodies the most difficult part of this case. Frontier Fishing vigorously contends that it would have been impossible for the F/V SETTLER to have traveled from plot A4 at 21:58 to the locality where it was sighted by Commander Diaz at 22:00 and to have been rounded by the USCGC

Spencer shortly thereafter.  Thus, according to Frontier Fishing,
the target identified in the RGA1 at 21:40, 21:47, 21:52, and
21:58 could not have been the F/V SETTLER.

     The ALJ did not address this issue directly in the
Discussion section of his decision.  Rather, in rejecting "[t]he
Respondents' Argument that the F/V SETTLER was incapable of
performing the various course and speeds indicated by the Coast
Guard" he focused on whether the F/V SETTLER could make the turns
necessary to account for the target's locations at 21:40, 21:47,
21:52, and 21:58. [A.R. II, Tab 106, pp. 13-14.]  Nevertheless,
in rejecting the Respondents Proposed Findings of Fact F-6 and J-
1d, the ALJ implicitly dismissed this impossibility theory.  For
the reasons explained below, I conclude that the ALJ's finding on
this discreet point is inconsistent with some of the other
findings of fact that he accepted.  The inconsistency is of such
significance that I find the ALJ's conclusion to be unreasonable
as it stands and will remand for further proceedings to include
purging the inconsistency from the evidentiary finding upon which
he relies.

     The parties agree that for the F/V SETTLER to have traveled
from A4 at 21:58 to A5 at 22:08, the vessel would have had to
travel at a consistent speed of about 5.7 knots.  The ALJ was
satisfied by the evidence that the F/V SETTLER could have
traveled at speeds up to 6 knots in the RGA1 with its gear

                              -29-

employed. [Id. at p. 14 n. 21.] Thus, the ALJ found that the Respondents did not demonstrate that the target in the RGA1 could not have been the F/V SETTLER.  The problem is that the 5.7 knot estimate assumes the F/V SETTLER traveled in a straight line from A4 to A5 heading south-west.  But, even if one assumes that the F/V SETTLER could have traveled at about 6 knots to get out of the RGA1 by 22:08, the direct path from A4 to A5 that the F/V SETTLER would have had to take is inconsistent with Commander Diaz' observations and the USCGC Spencer's position based on the header log.

The ALJ accepted as a fact that the F/V SETTLER was within 1,000 yards of the USCGC Spencer's starboard side at 22:00 as observed by Commander Diaz. [Respondents' Proposed Findings of Fact D-15 & F-2, Id. at pp. 39, 41.][17] Yet, for the F/V SETTLER to be within 1,000 yards of the USCGC SPENCER at 22:00, the F/V SETTLER would have had to travel 0.508 nautical miles in about 2 minutes at a speed of about 15.2 knots.  The Agency's Expert Dr.

---

[17] In the "Findings of Fact" section the ALJ stated that "[a]t approximately 2200, the USCGC SPENCER was approximately 1,000 yards from the vessel[.]"  [A.R. II, Tab 106, at p. 5.](emphasis supplied) I also note that Commander Diaz explained that "the 2200 time is, quite frankly, an approximation in my mind because I put down 2200.  I did not put down 2201 or 2207, or something more specific.  It's sort of a round number.  I put it approximately." [A.R. III, Tr. at p. 151.] He recalled that it was approximately 22:00 because it was before 22:05. [Id.] Nonetheless, the ALJ specifically "accepted and incorporated" Commander Diaz' testimony "that at 2200, the Spencer passed within 1,000 yards of the Settler with the Settler on Spencer's starboard side[.]" [A.R. II, Tab 106, at p. 41.]

Peterson made similar estimates based on the 1,000 yard observation, although in his figure he calculated the 1,000 yards from the USCGC SPENCER's position at 22:00, 22:01 and 22:02. [See A.R. V, Agency Exhibit 41, Figure 7.][18]

In addition to the "within 1,000 yards" observation, the ALJ accepted Commander Diaz' testimony that at 22:00 he personally saw the F/V SETTLER's lines or cables in the water. [Id. at pp. 5-6, 41; A.R. V, Agency Ex. 19; A.R. III, Tr. at pp. 70, 72, A.R. IV, Tr. at p. 592.] The ALJ also accepted that "the USCGC SPENCER passed the vessel rather closely in a starboard-to-starboard configuration" and that the USCGC "SPENCER carried out a turn to starboard ... bringing it to a heading of ... nearly due south during the one minute interval between 22:01 and 22:02." [A.R. II, Tab 106, at pp. 6, 48; A.R. IV, Tr. at pp. 592, 595, 643-44; see also Ensign Toomey's Testimony, A.R. III, Tr. at pp. 189-90.] The ALJ accepted Commander Diaz' testimony that after the turn, the USCGC SPENCER came around and ended up behind the F/V SETTLER "on his port quarter." [Id. at p. 48; A.R. IV, Tr. at p. 592.][19]

---

[18] Dr. Peterson's figure appears to show that the fishing vessel could only have reached a location 1,000 yards from the USCGC SPENCER's position at 22:02 traveling at the required minimum speed of 5.7 knots. [See A.R. V, Agency Exhibit 41, Figure 7.]

[19] I note, however, that Commander Diaz had testified earlier that after the USCGC SPENCER "came around behind him ... we're trailing him off of one quarter or the other. The port, the starboard, I don't remember which one. The point being that we weren't right behind him. ... We always take the station on

Professor Ouellette, Frontier Fishing and the ALJ seem to have interpreted this statement to mean that the F/V SETTLER was off the USCGC SPENCER's starboard side after the turn, because the port side of the F/V SETTLER appears on the video around 22:05 and is clearly to be seen at 22:08 off the USCGC SPENCER's starboard side. [A.R. V, Agency Ex. 41, Figure 4, Agency Ex. 38; see also Ensign Toomey's Testimony, A.R. III, Tr. at p. 191.] In addition, Professor Ouellette and Frontier Fishing infer that Commander Diaz's observations mean that the F/V SETTLER had to have been inside the USCGC SPENCER's turn.  The ALJ appears to have drawn the same conclusion because of his response to Respondents Proposed Findings of Fact H-9, to which I will return.  The ALJ also accepted Commander Diaz's testimony that the USCGC SPENCER then traveled behind the fishing vessel on a parallel course heading "nearly due south"[20] for several minutes before calling to it on the radio at 22:05. [Id. at p. 48; A.R. II, Tr. at p. 592.]

Based on these additional observations, Professor Ouellette opined that if the radar target had moved from A4 at 21:58 to

---

one quarter or the other. ... So we were off one quarter or the other at about 300 yards or so for most of the boarding." [A.R. III, Tr. at p. 147.] "I don't remember [whether we were starboard or port.] We sometimes shift." [Id. at pp. 147-48.]

[20] The plot of the header log shows that the USCGC SPENCER traveled nearly due South after the turn from about 22:03 until 22:08 and on. [A.R. V, Agency Ex. 41, Figs. 3, 4, 7.]

within 1,000 yards at 22:00 at an angle so that Commander Diaz could observe the trawl nets and the USCGC SPENCER could pass and circle the fishing vessel, then the target would have had to maintain a speed in excess of 25 knots. [A.R. V, Agency Ex. 41, p. 6] Similarly, Dr. Kan calculated that it would have required a speed in excess of 20 knots to move a vessel from the 21:58 radar position to the 22:00 visual position described by Commander Diaz. [A.R. V, Respondents Ex. 12.] Even if one does not credit the higher calculated speed as sufficiently explained and supported by the evidence, the only way to reconcile the header log and radar data with the observations made by Commander Diaz that were accepted by the ALJ is either to find that the F/V SETTLER was not at point A4 at 21:58 or that the F/V SETTLER traveled at a speed greater than 15 knots to be within 1,000 yards of the USCGC SPENCER at 22:00.  There is no evidence, either direct or in the form of expert opinion, suggesting that the F/V SETTLER could have traveled at that speed, even without its fishing gear employed.

To be sure, as the Agency argues, the ALJ did reject Professor Ouellette's testimony.  [A.R. V, Tab 106, pp. 36, 52.] But, those comments were made in response to the Respondents Proposed Findings of Fact related to Professor Ouellette's theory that the USCGC SPENCER was headed towards the F/V SETTLER on its purported direct trawl path rather than towards the radar

target.[21]  With respect to the Respondents Proposed Findings of

Fact F-6, the ALJ concluded that:

> The testimony, report, and opinion of Professor
> Ouellette concerning the speed of the F/V SETTLER under
> the aforementioned scenario are scientifically
> unreliable.  The record reveals that in formulating
> their opinion, all of Respondents' experts made gross
> assumptions that call into question the reliability of
> the expert testimony.  The Coast Guard's direct
> observation of the speed and maneuvers of the F/V
> SETTLER on the evening of October 16, 1997, including
> NOAA's expert testimony of Dr. Peterson and Mr.
> Setterstrom is given more weight.
> [A.R. II, Tab 106, p. 42.][22]

In context, this conclusion is unreasonable.  Professor

Ouellette's simple calculation of the speed the target would have

had to travel to get from A4 to a position consistent with

Commander Diaz's observations is scientifically reliable once

those observations are accepted as fact, as the ALJ appears to

---

[21] Professor Ouellette reasoned that Commander Diaz's
observations were at odds with what he should have seen if the
radar target had in fact been the F/V SETTLER and that they were
consistent with what he would have seen if he was headed towards
the F/V SETTLER on its purported direct trawl path.  Frontier
Fishing does not now challenge the ALJ's determination that
Professor Ouellette's testimony on this issue was unconvincing.

[22] To the extent the reference to "gross assumptions"
pertains to Professor Goudey's opinion that the F/V SETTLER would
not have been able to achieve speeds of more than 3.4 to 3.6
knots while trawling, I find that the ALJ's conclusion is
reasonable.  As the ALJ explained in his decision, Professor
Goudey "did not have sufficient information to reliably determine
the capacity and capability of the F/V SETTLER." [A.R. II, Tab
106, p. 13.] Similarly, the ALJ's rejection of Professor
Ouellette's testimony relating to the manually-inputted waypoint
as unconvincing is reasonable.

have done.  In addition, given his assumptions, the ALJ
unreasonably rejected Dr. Kan's determination that "the *SETTLER*
would have to have traveled speeds of 20 knots to travel from the
2158 position to the 2200 visual made by Commander Diaz" because
"[t]he speed between the 2158 position to the 2200 visual made by
Commander Diaz is unknown." [A.R. II, Tab 106, p. 52.] The ALJ
appears to have reasoned that since the evidence showed "that the
speed between the 2158 position and the 2208 position was 5.7
miles[,] ... Dr. Kan's testimony and expert opinion is not
supported by reliable and credible evidence." [Id.] This is
problematic.  The USCGC SPENCER did not measure the target's
speed between 21:58 and 22:08.  Rather, the target's speed was
simply calculated by dividing the minimum distance between A4 and
A5 by the time (10 minutes).  Evidence showing that the target
did not follow a direct straight line path between A4 and A5
would necessarily require the target to have traveled a greater
distance in the same amount of time and thus at a higher speed.
Similarly, if one accepts that the target was within 1,000 yards
of the USCGC SPENCER at 22:00, as the ALJ did, one can perform
the same mathematical calculation to determine the minimum speed
required to get from A4 to within 1,000 yards of the USCGC
SPENCER in 2 minutes rather than within 4 minutes.

    The ALJ's rejection of the Respondents Proposed Findings of
Fact H-2, H-4 and H-9 is also problematic given the assumptions

he adopted.  Although the ALJ accepted Commander Diaz's

observation that the USCGC SPENCER ended up "on his port quarter

and then <u>paralleling</u> him for several minutes" in response to the

Respondents Proposed Findings of Fact H-5, the ALJ rejected the

Respondents Proposed Findings of Fact H-2 that "[o]nce the

SPENCER completed its turn to starboard at 2202, it headed due

south, <u>paralleling</u> the SETTLER." [A.R. II, Tab 106, pp. 47-48.]

The ALJ explained that:

> The relative position of the USCGC SPENCER vis-à-vis
> the F/V SETTLER is unknown.  However, the overwhelming
> weight of the evidence shows that the F/V SETTLER was
> .66 nautical miles inside Restricted Gear Area I at
> 2158, and the vessel was still inside Restricted Gear
> Area I at 2200....

[<u>Id.</u> at p. 148.] The only evidence that the target was still

inside the RGA1 at 22:00 is Dr. Peterson's extrapolation of the

location of the target at 22:00 by assuming it traveled on a

straight path from A4 to A5 at the calculated minimum speed of

5.7 knots. [A.R. V, Agency Ex. 41, Figs. 7, 8.] Even Commander

Diaz's identification of the target's location at 22:00 is based

on an extrapolation from its location at 21:58 and again at

22:08. [A.R. III, Tr. at p. 73; A.R. IV, Tr. at p. 593.]

   With respect to the Respondents Proposed Findings of Fact H-

4 that "[t]he header log demonstrates that after completing the

turn SPENCER was about 50 yards inside of the Restricted Gear

Area moving parallel to the boundary in a southerly direction,"

the ALJ simply held that "[t]he exact location of the USCGC

-36-

SPENCER in the Restricted Gear [Area] is unknown.  See also
Respondents Proposed Findings of Fact H(2) and the Ruling
thereunder." [A.R. II, Tab 106, p. 48.] This conclusion is
untenable, especially since, as Frontier Fishing points out, the
Agency's case rests on the USCGC SPENCER's ability to position
the location of radar contacts relative to its own known position
and therefore relative to the RGA1.

     The ALJ's response to the Respondents Proposed Findings of
Fact H-9 is similarly flawed.  The Respondents proposed that
"[c]learly *SPENCER* was not moving parallel to the track line
between the 2158 (A-4) to 2208 (A-5) radar locations, nor was it
far enough inside of the gear area to follow down b[eh]ind such a
purported target." [A.R. II, Tab 106, p. 49.] The ALJ rejected
this proposition because:

>      The overwhelming weight of the evidence shows the F/V
>      SETTLER was plotted up to seven-tenths of a mile inside
>      Restricted Gear Area I at 2140, and then again at 2147,
>      2152, and 2158. ... The evidence shows that the F/V
>      SETTLER was .66 nautical miles inside Restricted Gear
>      Area I at 2158, and the vessel was still inside the
>      Restrict Gear Area at 2200. ... Thus, the USCGC SPENCER
>      must have been further inside the Restricted Gear Area
>      to come around the F/V SETTLER around 2200."

[Id.] (emphasis supplied) It would be one thing if the ALJ
discounted the accuracy of Commander Diaz's observations, but
here the ALJ appears to be rejecting the USCGC SPENCER's likely
path from 21:58 to 22:08, as determined by its DGPS location
every minute, in order to reconcile Commander Diaz's observations

with the speed the F/V SETTLER would have had to maintain in
order to get from A4 to A5 in 10 minutes.

Given the ALJ's untenable resolution of this impossibility
argument, I conclude that the Secretary's Findings and Order must
be set aside because they cannot be said to be supported by
substantial evidence.  This conclusion, of course, does not
exonerate the F/V SETTLER of the charges.  Rather, the remand of
the case to NOAA is designed to permit review of the entire case,
including the contradictory evidence, shorn of reliance upon
unreasonable assumptions.  The impossibility of the F/V SETTLER
traveling from A4 to A5 at speeds necessary to match Commander
Diaz's observations from 22:00 to 22:08 does not arise in a
vacuum.  Frontier Fishing has consistently proposed a theory that
attempts to reconcile the F/V SETTLER's course on October 16,
1997, the radar fixes at 21:40, 21:47, 21:52, and 21:58, and the
observations made by the USCGC SPENCER's crew.  While the ALJ was
not convinced that the other elements of the so-called "phantom
vessel" explanation rebutted the Agency's prima facie case, they
must be reviewed without reliance upon an internally untenable
assumption about vessel speed and location.

Given the ALJ's unreasonable determination with respect to
the second impossibility theory, I find that the record "clearly
precludes the [Agency's] decision from being justified by a fair
estimate of the worth of the testimony of witnesses or its

informed judgment on matters within its special competence or both." <u>Penobscot</u>, 164 F.3d at 718 <u>citing</u> <u>Universal Camera</u>, 340 U.S. at 490.  Consequently, I remand this case to NOAA for a de novo review based on the entire record, including such further development of the record, <u>see generally</u> Note 8 <u>supra</u>, as appears advisable to the ALJ.

### III. CONCLUSION

For the reasons set forth more fully above, after DENYING
Frontier Fishing's Motion for Leave to File Supplementation to
the Administrative record and ALLOWING the Defendants' Motion to
Strike Plaintiff's New Exhibits, I GRANT Frontier Fishing's
motion for summary judgment, remanding the case to the ALJ and I
DENY the Defendants' motion to affirm NOAA's decision.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE